996 F.2d 1215
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Samirat HAFIZ, Plaintiff-Appellant,
v.
ELECTRONIC DATA SYSTEMS CORPORATION, Defendant-Appellee.
 Nos. 91-2311, 92-2293.
 United States Court of Appeals, Sixth Circuit.
 June 25, 1993.
 
 Before JONES and BATCHELDER, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff-Appellant Samirat Hafiz appeals the district court's grant of summary judgment for Defendant-Appellee Electronic Data Systems Corporation ("EDS") in this wrongful discharge, retaliatory discharge and discriminatory discharge case. For the reasons stated herein, we affirm.
 
 I.
 
 2
 Hafiz, an Egyptian Moslem, began her employment with General Motors Corporation ("GM") in 1978 as a systems analyst/engineer in data processing. She signed an employment agreement with GM on May 30, 1978. Under the employment agreement, Hafiz was employed month-to-month on a calendar month basis. According to Hafiz, she was told by GM officials that as long as she did a good job she would never be fired and that GM never lays off its engineering staff, even in the hardest of times.
 
 
 3
 While employed at GM, Hafiz was evaluated by her supervisors several times. The overall evaluations were "good--competent" or better. Some of the individual areas of evaluation ranged from "highly effective" or "superior" to "needs improvement."
 
 
 4
 In late 1984, GM purchased EDS. GM's systems-related operations transferred from GM to EDS. As a part of this transfer, Hafiz became employed as a systems engineer with EDS, starting on January 1, 1985. No employment agreement with EDS was signed by Hafiz because GM transitioners were not required to sign employment agreements with EDS.
 
 
 5
 Hafiz's first job assignment with EDS was in Mesa, Arizona, working on the X car. Her supervisor was Ken McWatters. While in Arizona, she received an EDS Stock Purchase Agreement which she signed and dated on February 27, 1985. A paragraph in a prospectus that generally accompanied the Stock Purchase Agreement (Hafiz has testified that she does not remember receiving a copy of the prospectus when she received the Stock Purchase Agreement) states "[n]othing herein contained ... shall affect the rights of the Company to terminate any participant's employment at any time for any reason." Supp. J.A. at 153.
 
 
 6
 Hafiz worked on the X car project in Arizona until July 16, 1985. On July 16, 1985, Hafiz returned to Michigan where she continued to work on the project until March 1986. While in Michigan, her group supervisor was Tong Pak. In early March 1986, Hafiz was called into Pak's office to discuss Hafiz's next project. As a result of this meeting, Pak told Hafiz that she needed to look for other job opportunities within EDS.
 
 
 7
 Disturbed by Pak's statement that she needed to look elsewhere for a job, Hafiz requested and received an "open door"[1] meeting with Keith Miller, Pak's manager. At this meeting, Hafiz indicated that she felt as though she and Pak could not work together and that she was being harassed by management. This meeting concluded with Miller deciding that he would seek feedback from other supervisors and users on Hafiz's performance during the preceding five years. Hafiz supplied a list of names from which Miller could solicit comments. Miller supplemented the list and contacted twenty individuals.
 
 
 8
 On March 11, 1986, Miller approved Pak's performance appraisal of Hafiz. Pak rated her marginal, the lowest EDS rating possible. On April 1, 1986, Pak met with Hafiz to discuss the appraisal; however, the full report was not discussed with her until July. On April 11, 1986, Miller completed his survey of Hafiz's past performance. His compilations--some favorable, some not favorable--were shared with Hafiz soon thereafter. On July 11, 1986, Hafiz and Pak met again for a discussion of her annual performance appraisal which was done by him.
 
 
 9
 On July 28, 1986, Hafiz filed a complaint with the Michigan Department of Civil Rights. On July 31 or August 1, 1986, the appraisal and a performance improvement plan were given to her. The performance improvement plan is a mechanism used at EDS to attempt to bring substandard performance to an acceptable level. In addition, her supervisor was notified that she filed a complaint around that same time period.
 
 
 10
 After a vacation and attendance at a training session in August, Hafiz requested and received, starting in late August 1986, medical leave for a stress-related disability.
 
 
 11
 In late November 1986, Hafiz was notified, according to EDS practices for a stress-related disability, to report to an EDS doctor for evaluation regarding her ability to return to work. Hafiz had not previously supplied a return date to EDS. On December 1, 1986, a doctor evaluated Hafiz as being able to return to work. Once an employee is evaluated as able to return to work, his/her eligibility for medical leave is suspended. An employee can take uncompensated personal leave when no longer eligible for medical leave. Hafiz was notified that her medical leave would be terminated as of December 5, 1986.
 
 
 12
 On December 5, 1986, Hafiz returned to her place of employment and met with Pak and McWatters (McWatters replaced Miller as manager sometime in September 1986). After being notified that unpaid personal leave of absence was available, Hafiz took a two-week unpaid personal leave of absence. Her official return to work date was December 19, 1986. At that time, she met with Pak and McWatters. She was informed that she was still under the performance improvement plan of July/August 1986. She was also informed that she was required to provide a doctor's excuse for any sick day taken.
 
 
 13
 Hafiz was assigned the TOPS project, which she worked on from December 19, 1986 to her termination in January 1987. According to Hafiz, this project, riddled with problems, was designed to fail and give EDS an excuse to discharge her. On January 31, 1987, Hafiz was notified of her termination because she had not made progress on the performance improvement plan.
 
 
 14
 Hafiz originally filed a complaint in the Wayne County Michigan Circuit Court on July 11, 1989. EDS removed the case to the United States District Court for the Eastern District of Michigan on the basis of diversity of citizenship. A second amended complaint, filed on May 21, 1990, stated the following claims: 1) wrongful termination contrary to the policies, practices, and procedures of EDS which implied "just-cause" rather than "at-will" employment; 2) retaliatory discharge for filing a complaint with the Michigan Department of Civil Rights, in violation of Section 701 of the Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Ann. § 37.2701(a) (West 1985); and 3) discriminatory discharge based on religion and national origin, in violation of Section 202 of the Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Ann. § 37.2202(1)(a) (West 1985 & Supp.1993).
 
 
 15
 After discovery, EDS moved for summary judgment. On October 17, 1991, the district court granted EDS' motion for summary judgment on all of Hafiz's claims.
 
 II.
 
 16
 This Court's review of a grant of summary judgment is de novo; it uses the same test that was used by the district court. See Brooks v. American Broadcasting Cos., 932 F.2d 495, 500 (6th Cir.1991). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See also Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988). " '[I]nferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " Brooks, 932 F.2d at 500 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam))).
 
 III.
 
 17
 Hafiz first claims that EDS breached its employment agreement with her by discharging her without cause. Hafiz argues that there is a genuine issue of material fact regarding whether her employment with GM and EDS was "just-cause" employment, meaning that she could not be fired without cause. To support her contention that she could only be fired for cause, Hafiz points to EDS and GM statements, policies, and practices including
 
 
 18
 1) statements made to her at the time she was hired about job security at GM; 2) statements contained in the GM handbook which contained promises of job security; 3) statements made by EDS that it would honor GM policies; and 4) reliance on the practice of both EDS and GM that persons did not get fired, even when they made errors--instead they were transferred, demoted, but never discharged.
 
 
 19
 Appellant's Br. at 32. In addition, Hafiz points to a special edition of the EDS newsletter in which Ken Riedlinger, Senior Vice President of EDS, stated that transitional GM workers would not lose their GM benefits or job security when they transitioned from GM to EDS.
 
 
 20
 EDS contends, and the district court agreed, that Hafiz's employment was terminable at-will. EDS argues that Hafiz has made allegations which do not demonstrate that there was a mutually assented to just-cause employment relationship. In addition, EDS points to the prospectus to the Stock Purchase Agreement which indicated that EDS had the right to terminate Hafiz's employment at any time for any reason.
 
 
 21
 The Michigan Supreme Court has recognized that month-to-month employment is "essentially" an at-will relationship. Ferrett v. General Motors Corp., 475 N.W.2d 243, 248 (Mich.1991). Furthermore, under Michigan law, "contracts for permanent employment are for an indefinite period of time and are presumptively construed to provide employment at will." Rowe v. Montgomery Ward & Co., 473 N.W.2d 268, 271 (Mich.1991). "When contract claims rest on proofs of oral representations, the presumption provides assurance that oral contracts for an indefinite term, which fall outside the statute of frauds, will be recognized only where circumstances suggest both parties intended to be bound." Id. An exception to the at-will presumption exists when there is an express agreement to terminate only for cause or when an employee has a legitimate expectation of a just-cause contract. Toussaint v. Blue Cross & Blue Shield of Mich., 292 N.W.2d 880, 885, 890 (Mich.1980).
 
 
 22
 "In deciding whether there was mutual assent to a just-cause provision, [Michigan courts] use an objective test, 'looking to the expressed words of the parties and their visible acts.' " Rowe, 473 N.W.2d at 273 (emphasis in original) (citations omitted). A footnote in a concurring opinion in Rowe suggests factors to be considered:
 
 
 23
 Among the circumstances identified as objective indications of intent are the clarity, specificity, and lack of ambiguity of oral statements; whether there were specific negotiations for job security; the nature of the position; and whether, if policy statements are relied on, they support or undercut a reasonable belief that a promise of job security was being extended.
 
 
 24
 Id. at 283 n. 4 (Boyle, J., concurring).
 
 
 25
 To the extent that Hafiz relies on any employment agreement with GM to show that she could be terminated only for just-cause, the employment agreement with GM established an at-will employment. The agreement that she signed in 1978 stated, "The Employe acknowledges that his employment under this agreement is from month to month only on a calendar month basis." Supp. J.A. at 160. Furthermore, the agreement provided:
 
 
 26
 The Employer and the Employe acknowledge that there are no other arrangements, agreements, or understandings, verbal or in writing, regarding same and that any modification or amendment hereof, other than a cancellation and replacement hereof by another written form of agreement, must be endorsed hereon in writing and initialed by both the Employe and the Employer.
 
 
 27
 Id.
 
 
 28
 As this Court recently stated in an unpublished opinion involving a person who worked for GM before being transitioned to EDS, "[o]nce [the plaintiff] signed the agreement acknowledging that his employment was month-to-month, [the plaintiff] could entertain no legitimate expectation of never being discharged without just-cause. By its own terms, the Employment Agreement could only be modified by a new agreement signed by both parties." White v. Electronic Data Sys. Corp., No. 91-2379 (6th Cir. Aug. 28, 1992) (WL, CTA6) (citations omitted). See also Taylor v. General Motors Corp., 826 F.2d 452, 457-58 (6th Cir.1987).
 
 
 29
 To the extent that Hafiz relies on any employment agreement with EDS, that reliance also creates only an at-will agreement. Using the factors enunciated in Justice Boyle's concurrence in Rowe, there are no objective indications of intent on the part of EDS to provide just-cause employment. Any written or oral statements made by EDS would have to be viewed as merely expressions of optimistic hope of a long-term relationship. See Duncan v. Rolm Mil-Spec Computers, 917 F.2d 261, 264 (6th Cir.1990). Furthermore, there were no specific negotiations with EDS for job security. Cf. Rowe, 473 N.W.2d at 274-75.
 
 
 30
 The Stock Purchase Agreement prospectus adds further evidence that Hafiz's employment with EDS was terminable at-will. The prospectus states that "[n]othing herein contained ... shall affect the rights of the Company to terminate any participant's employment at any time for any reason." Supp. J.A. at 153. Although Hafiz denies receiving a copy of the prospectus, by signing the stock purchase agreement, she specifically acknowledged receipt of the prospectus and agreed to abide by its terms. It is well-established that a person is presumed to understand the terms of those documents that she signs. Scholtz v. Montgomery Ward & Co., 468 N.W.2d 845, 848-49 (Mich.1991). Thus the language of the prospectus put Hafiz on notice that her employment at EDS was at-will. Cf. Rosinski v. Electronic Data Sys. Corp., No. 90-2133 (6th Cir. June 18, 1991) (WL, CTA6) (although the stock agreement was held to be collateral to any employment contract, the agreement was held to be significant in that case because it was a major reason the employee took the job with EDS).
 
 
 31
 This claim is without merit.
 
 IV.
 
 32
 Hafiz next contends that her filing of a discrimination complaint with the Michigan Department of Civil Rights resulted in a retaliatory discharge in violation of Section 701 of the Elliott-Larsen Civil Rights Act.[2] Defendant argues, and the district court agreed, that Hafiz cannot present sufficient facts to support a prima facie showing of retaliatory discharge under Section 701. In addition, EDS contends, and the district court concluded, that EDS has shown valid non-discriminatory reasons for the discharge.
 
 
 33
 Section 701 prohibits discrimination or retaliation against a person "because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." Mich.Comp.Laws.Ann. § 37.2701(a).
 
 
 34
 In a case of a retaliatory discharge claim filed under Section 701, it is proper for courts to engage in a burden-shifting type of analysis that was enunciated in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1310-11 (6th Cir.1989).
 
 
 35
 Pursuant to Burdine, an employee first must establish a prima facie case of retaliatory discharge. 450 U.S. at 252-53. If a prima facie case has been shown, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the discharge. Id. at 253. Finally, if the employer carries its burden, the employee has the burden of showing that the reason offered by the employer is merely pretext for discharging the employer for an invalid reason. Id.
 
 
 36
 This court has outlined the requirements which would satisfy a prima facie case under Section 701:
 
 
 37
 In order to establish a prima facie case of unlawful retaliation under Elliott-Larsen, a plaintiff must establish (1) that he opposed violations of the Act or participated in activities protected by the Act, and (2) that the opposition or participation was a significant factor in an adverse employment decision. "The 'significant factor' standard ... requires a showing of more than a 'causal link.' A factor can be a 'cause' without being 'significant.' Only the latter is sufficient to show retaliatory discharge."
 
 
 38
 Booker, 879 F.2d at 1310 (citations omitted).
 
 
 39
 In addition, this Court has stated that pretext may be established only by a " 'direct showing that a discriminatory reason motivated the employer or by showing that the proffered reason is not worthy of credence.' " Id. at 1314 (citations omitted).
 
 
 40
 In this case, Hafiz engaged in protected activities on July 28, 1986 when she filed a discrimination complaint with the Michigan Department of Civil Rights. Mich.Comp.Laws.Ann. § 37.2701(a). EDS does not dispute this fact. Nor does EDS dispute that Hafiz was discharged after she engaged in the protected activity. EDS contends that Hafiz cannot show a significant link between the filing of the discrimination charge and her discharge.
 
 
 41
 Hafiz points to the following as evidence of the significant causal link: 1) she was given the performance improvement plan on July 31 or August 1, only a few days after she filed the discrimination charge, and was given thirty days to achieve the objectives in the performance improvement plan; and 2) "[t]he TOPS project was created specifically as a pretext in order to support EDS' decision to discharge [her]." Appellant's Br. at 36-37.
 
 
 42
 According to Hafiz, the performance improvement plan was given to her after July 28, 1986. The plan was merely a follow-up to the marginal rating she was notified of well prior to July 28. As a result, being given a performance improvement plan, in and of itself, does not provide the appropriate nexus between the protected activity and the alleged retaliation. We find that, in this particular case, there is no evidence linking the performance improvement plan to Hafiz's filing of her complaint with the Michigan Department of Civil Rights. See Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir.1986) (where plaintiff received citations for performance deficiencies before and after she filed her discrimination charge with state civil rights agency, we held that plaintiff failed to establish prima facie case of retaliatory discharge--even though there was a close proximity in time between her charge filing and her discharge and even though there was an increase in post-charge deficiency citations--because there was no direct link between the citations and the filing of the charge).
 
 
 43
 As to her other claim of retaliatory action, we hold that there is also no significant link between the protected activity and the retaliatory action. While it may be possible that the TOPS project was created by EDS specifically to fail and provide EDS with a reason to discharge her, Hafiz has presented no evidence to support that allegation.
 
 
 44
 Assuming arguendo that Hafiz has established her prima facie face, EDS has presented a valid reason for discharging her, namely that she had poor performance. EDS can point to her poor performance predating her filing of the charge with the Michigan Department of Civil Rights. Furthermore, Hafiz has failed sufficiently to show that the reason given by EDS is pretextual. She makes various conclusory allegations without any evidentiary support.
 
 
 45
 This claim is without merit.
 
 V.
 
 46
 Hafiz next argues that there is a genuine issue regarding whether EDS' action in terminating her employment was done, in whole or in part, because of her national origin and religion, in violation of the Section 202 of the Elliott-Larsen Civil Rights Act.
 
 
 47
 As with count II, the Burdine burden-shifting analysis applies to a discriminatory discharge claim filed pursuant to Section 202. Therefore, in order for Hafiz to prevail, she must first establish a prima facie case of discrimination. Then, the employer is given an opportunity to present valid non-discriminatory reasons for her discharge. Finally, Hafiz can prevail by showing that the reasons proffered by the employer are pretextual.
 
 
 48
 Under Section 202, Hafiz can establish a prima facie case by proving either 1) disparate treatment because of national origin or religion or 2) that the employer engaged in intentional discrimination. Singal v. General Motors Corp., 447 N.W.2d 152, 155 (Mich.App.1989).
 
 
 49
 Under the disparate treatment prong, Hafiz must show that she was a member of a protected class and that she was treated differently than similarly situated non-protected employees who engaged in the same or similar conduct. Id. at 156; See Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir.1992) (summary judgment is appropriate where employee fails to prove that the comparable employees are similarly situated in all respects, meaning that the comparables must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct). EDS does not dispute Hafiz's contention that she is in a protected class.
 
 
 50
 Hafiz points to several individuals she contends were similarly situated and yet were treated differently. First, she points to several employees she alleges were younger and less qualified than she, but were promoted when she was denied promotions. Hafiz gives no insight into the performance ratings or objective qualifications of the alleged comparables, much less as to whether or not they performed the same job for the same supervisor. Second, Hafiz points to an employee who was treated differently while on medical leave. However, that employee was not similarly situated because that employee returned to work as soon as she was medically released while Hafiz wanted to continue on leave despite a doctor's letter advising that she was medically able to return to work. As a result, Hafiz has not provided the Court with evidence of similarly situated individuals.
 
 
 51
 Under the intentional discrimination prong, Hafiz must show that she is a member of a protected class, that she was discharged, and that the person who discharged her was predisposed to discriminate against those in her class and had actually acted in accordance with that predisposition. Singal, 447 N.W.2d at 155-56. In this case, EDS contends and the district court concluded that the persons responsible for Hafiz's discharge were her immediate supervisor, Pak, and his manager, Miller. Hafiz has not presented any evidence which shows that either of these two had a predisposition to discriminate against those in her class and acted on that predisposition. Rather, Hafiz points to statements made by someone other than those two individuals. Specifically, Hafiz points to a comment made by Doreen Marlow, Hafiz's project leader for a short period of time. Marlow provided Hafiz with her work assignments and direction. Thomas Caiati, an EDS supervisor, vaguely remembered Marlow stating something to the effect that she did not like or was not getting along with Hafiz because of Hafiz's religion and/or nationality.
 
 
 52
 Notwithstanding Caiati's vague recollections regarding Marlow's statement, Marlow was not involved in the decision to discharge Hafiz. Pak testified in his deposition that he made the decision to terminate Hafiz. He further testified that he consulted McWatters and Lisette Rodriquez, an employee in the employee relations department. Because the vague comments attributed to Marlow were not made by the official responsible for terminating Hafiz, we find that, in this case, there is no nexus between the statements and the discharge. See Wilson v. Stroh Cos., 952 F.2d 942, 945-46 (6th Cir.1992) (summary judgment on Section 202 claim appropriate where plant manager's racial animus could not be imputed to upper-level manager who made the decision to terminate the employee); McDonald v. Union Camp Corp., 898 F.2d 1155, 1161 (6th Cir.1990) (noting that the discriminatory remarks were made by an individual who was not the official responsible for terminating the plaintiff, this Court held that there simply was no nexus between the statements and the discharge).
 
 
 53
 This claim is without merit.
 
 VI.
 
 54
 For the foregoing reasons, we affirm.
 
 
 
 [1]
 The EDS open door meeting "provides the opportunity for any team member to talk to any leader she feels is appropriate or necessary to resolve a problem or implement an idea." Supp. J.A. at 307 (Affidavit of Keith Miller)
 
 
 [2]
 Because the Elliott-Larsen Civil Rights Act provides similar protections as those provided in Title VII, see Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1311-12 (6th Cir.1989), and because Michigan courts look to Title VII when resolving questions arising under the Elliott-Larsen Civil Rights Act, see id.; Sumner v. Goodyear Tire & Rubber Co., 398 N.W.2d 368, 376 (Mich.1986), we refer, in part, to cases involving Title VII when dealing with Hafiz's claims raised under the Elliott-Larsen Civil Rights Act