LaVaughn BOOKER,
Plaintiff–Appellant,

*v.*

**BROWN & WILLIAMSON TOBACCO CO., INC., Defendant–Appellee.**

No. 88–1331.

United States Court of Appeals,
Sixth Circuit.

Argued May 15, 1989.

Decided July 3, 1989.

Frank D. Eaman (argued) Bellanca, Beattie and De Lisle, Detroit, Mich., for plaintiff-appellant.

Charles H. Tobias, Kevin I. Green (argued), Detroit, Mich., for defendant-appellee.

Before MILBURN and NELSON, Circuit Judges; and PECK, Senior Circuit Judge.

MILBURN, Circuit Judge.

Plaintiff-appellant LaVaughn Booker appeals from the summary judgment entered by the district court in favor of defendant-appellee Brown & Williamson Tobacco Corporation ("Brown & Williamson") in this civil rights action. For the reasons that follow, we affirm.

### I.

#### A.

Booker initiated this action on March 3, 1987, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e17, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Following the close of discovery, Brown & Williamson filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, alleging that plaintiff Booker could not establish a prima facie case of race discrimination and that he was demoted for legitimate, nondiscriminatory reasons which he could not establish as pretextual. Following a hearing on October 23, 1987, the district court granted summary judgment in favor of Brown & Williamson, concluding that there existed no genuine issue of material fact as to Brown & Williamson's proffered nondiscriminatory reasons for his demotion. Summary judgment dismissing Booker's federal claims was entered on October 28, 1987.

However, the day before the hearing on the motion for summary judgment, the magistrate granted Booker's motion for leave to file an amended complaint thereby allowing him to add state law claims under the Elliott–Larsen Civil Rights Act, Mich. Comp. Laws Ann. §§ 37.2101–37.2804 ("Elliott–Larsen" or "the Act"). An order to this effect was entered on October 22, 1987. Due to the timing of the magistrate's decision, Brown & Williamson's original motion for summary judgment was limited to Booker's federal claims.

Booker filed his amended complaint on November 30, 1987, wherein he alleged two different claims of race discrimination under Elliott–Larsen; viz., one count of discrimination and one count of retaliation. Brown & Williamson subsequently filed a second motion for summary judgment on December 17, 1987, contending that the state law claims were barred under the doctrine of res judicata and that Booker had still failed to raise a genuine issue of material fact as to the proffered reasons for his demotion. On March 1, 1988, the district court again concluded that there existed no genuine issue of material fact and granted summary judgment on the remaining claims. A final judgment was entered on March 7, 1988, and this timely appeal followed.

#### B.

Brown & Williamson is a manufacturer of cigarettes and tobacco products and employs a nationwide sales force to promote and assist in the distribution of its products. The sales force is divided into departments and further subdivided into divisions. Each division has sales representatives who are supervised by a division manager.

Plaintiff Booker, a black male, was hired by Brown & Williamson on March 13, 1978, and worked as a sales representative in

North Carolina until November 21, 1979, when, according to Booker, he was promoted to the position of account manager. He held the position of account sales manager until April 1, 1982, at which time he was promoted to the position of division manager in Troy, Michigan. Booker held the position of division manager from 1982 until his demotion on October 1, 1985. However, following his demotion, he continued to receive the same rate of pay as that of a division manager.

Brown & Williamson contends that Booker was demoted from his supervisory position because of his management style and, in particular, his handling and treatment of his subordinates and customers. Lanny Butler (Brown & Williamson's vice-president of sales), Charles Pavona (Booker's immediate supervisor), and Glen Korfhage (Pavona's supervisor), all of whom recommended Booker's demotion, testified in their depositions that from the outset of his employment as division manager, Booker was repeatedly advised of the need to improve his managerial style, primarily his manner of directing and handling people, and that his failure to correct this deficiency ultimately led to his demotion.

Brown & Williamson presented proof of several instances of Booker's alleged poor supervisory skills. In December of 1984, Booker wrote a letter to one of his sales representatives, severely criticizing him for communicating directly with Pavona, the department manager and Booker's immediate supervisor. The sales representative was harshly chastised for failing to submit the letter first to Booker, was informed that "intelligence is a luxury, sometimes useless, sometimes fatal," and that "those who are greedy of praise prove they are poor in merit." As a result of this correspondence, as well as with other problems he was allegedly experiencing with Booker, the sales representative contacted Pavona and requested a transfer out of Booker's division. Pavona testified that he denied the transfer at that time because he was unfamiliar with the situation, but that he did discuss the matter with Booker.

In the same month, Pavona was contacted by a customer who complained about Booker's handling of that customer's account. After various attempts to resolve the problem, Pavona ultimately removed Booker from the account and replaced him with a division manager who had previously handled it. Pavona testified that during his investigation into this matter, he also discovered that Booker had improperly provided confidential information concerning one customer to another customer, a competitor.

On July 17, 1985, Pavona received a request from a second representative, Joseph Beale, for a transfer out of Booker's division. In making his request, Beale outlined a number of problems which he was having with Booker, including alleged unfair treatment, harassing telephone calls, threats of termination for minor offenses, and the repeated use of foul language. A second meeting was held, attended by both Pavona and Pavona's supervisor, Korfhage, the area manager. At this second meeting, Beale confirmed his earlier discussions with Pavona and went into greater detail concerning the treatment which he had received from Booker. At the time, however, Beale was on probation, and Pavona and Korfhage questioned his credibility. Therefore, they determined that Beale's charges should be the subject of further investigation.

As a result, Pavona met with five other sales representatives within Booker's division to investigate Beale's allegations. These meetings were conducted between July and August 1985, and Beale's allegations were substantially confirmed. For example, Pavona was told that many of the representatives were afraid of Booker, that he repeatedly used profanity, that he was demanding and militaristic, that he repeatedly threatened his subordinates with termination for even the most minor mistakes, and that he used physical intimidation and often verbally abused subordinates until they began to cry.

Pavona and Korfhage met with Booker on August 14, 1985, and advised him that his managerial behavior and style were un-

acceptable and that if he did not improve, he would be demoted or terminated. This warning was also confirmed in writing in the form of a letter given to Booker dated August 13, 1985. The letter explicitly stated that Booker would be terminated or demoted if his managerial style did not improve.

There were three subsequent events which Brown & Williamson allege ultimately resulted in Booker's demotion. First, after learning of Beale's conversation with Pavona, Booker prepared a termination report on Beale, which, according to Brown & Williamson, contains inappropriate statements and allegations. The report contends that Beale had absconded with company funds because of drug usage and sexual fantasies and that Beale was making plans for a robbery of the company. Beale admits that an audit resulted in discovery of a fund shortage for which he was responsible, but contends that Booker made up the allegations of drugs, sexual misconduct, and robbery in an apparent attempt to punish him for talking to Pavona.

Second, on August 26, 1985, Booker sent a letter to the head of Brown & Williamson's Human Resources Department in which he attacked and attempted to blame all of his problems on his supervisor, Pavona. He contends that the remarks in his employer's letter of August 13, 1985, were "slanderous" and that his subordinates have been forced, against their will, to discredit him.[1] In his letter, Booker contends that Pavona, when referring to Blacks, has stated that "I don't know if these people can comprehend asset management." Booker contested all the company's complaints about his managerial style and claimed that "this is a case of ethnocism, which should be investigated immediately. I respectfully request, that no decision be made to transfer me until I have been formally exculpated of Mr. Pavona's charges."

Finally, Ed Carman, one of Booker's customers, complained to Butler and Pavona about Booker's mistreatment and lack of respect for him and his employees. Carman refused to allow Booker back into his establishment because of Booker's lack of respect and authoritarian manner.[2]

In light of the above three instances which occurred shortly after the warning to Booker, Pavona and Korfhage recommended to Butler, vice-president of sales, that Booker be demoted. They contended that these incidents confirmed his poor management style and were evidence of his unwillingness to change as requested. Pursuant to Korfhage's and Pavona's recommendation, Butler testified that he decided Booker's style could no longer be tolerated and that he should be demoted to a position of sales representative in Columbus, Ohio, with no reduction in his rate of pay. Booker was advised of the decision on October 1, 1985, and indicated that he did not wish to go to Columbus. He was then given the option to choose the division in which he desired to work, and he chose a sales representative position in North Carolina, a position he currently occupies. On November 1, 1985, Tracy Gray, a Black male, was promoted and replaced Booker as division manager.

In his brief, the only holding of the district court which Booker addresses is with respect to his state law Elliott–Larsen retaliatory demotion claim. He does not address or challenge the district court's holding with respect to his federal claims nor the district court's holding with respect to his state law claim of discrimination. Accordingly, the sole issue before this court on appeal is whether the district court erred in granting summary judgment with respect to the state law retaliation claim. *See McMurphy v. City of Flushing*, 802

---

1. In affidavits taken during discovery, all the sales representatives in question stated that the comments made to Pavona and Korfhage were correct and that when Booker found out about the meeting, he convened them at his house and through intimidation and threats of termination forced them to sign false affidavits contradicting what they had told Pavona and Korfhage.

2. Carman stated that if "Booker wanted to run his kingdom outside of these walls he could but he was not going to run them inside [my] place of business."

F.2d 191, 198–99 (6th Cir.1986) (issues raised in the district court yet not pursued on appeal are considered abandoned).

## II.

### A.

Under the Federal Rules of Civil Procedure, summary judgment should be entered only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* 106 S.Ct. at 2512. "By its very terms, the standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 2510 (emphasis in original). A party that opposes a motion for summary judgment has the burden to come forth with requisite proof to support its legal claim, particularly where the opposing party has had an opportunity to conduct discovery. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In reviewing a district court's ruling on a motion for summary judgment, this court's role is identical to that of the district court. *Hand v. Central Transport, Inc.,* 779 F.2d 8, 10 (6th Cir.1985) (per curiam). All facts and inferences "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

### B.

The Elliott–Larsen Act prohibits discrimination or retaliation against a person "because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding or hearing under this act." Mich. Comp.Laws Ann. § 37.2701(a). Booker contends that his letter of August 26, 1985, constitutes a sufficient "charge" or "complaint" to invoke the protections of the Act, upon the disparaging remark that Pavona allegedly made concerning Blacks, and upon Brown & Williamson's concession that the letter was one of several reasons underlying his demotion.

In order to establish a prima facie case of unlawful retaliation under Elliott–Larsen, a plaintiff must establish (1) that he opposed violations of the Act or participated in activities protected by the Act, and (2) that the opposition or participation was a significant factor in an adverse employment decision. *See Polk v. Yellow Freight System, Inc.,* 801 F.2d 190, 199 (6th Cir. 1986); *see also Jackson v. Pepsi–Cola, Dr. Pepper Bottling Co.,* 783 F.2d 50, 54 (6th Cir.) (unlawful retaliation under Title VII), *cert. denied,* 478 U.S. 1006, 106 S.Ct. 3298, 92 L.Ed.2d 712 (1986). "The 'significant factor' standard ... requires a showing of more than a 'causal link.' A factor can be a 'cause' without being 'significant.' Only the latter is sufficient to show retaliatory discharge." *Polk,* 801 F.2d at 199.

Initially, Booker contends that the district court erred in analyzing his Elliot–Larsen retaliation claim pursuant to the analysis articulated by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in that an alternating or shifting evidentiary burden is not to be employed for an Elliott–Larsen claim. He relies upon the holding of the Michigan Court of Appeals in *Kocenda v. Detroit Edison Co.,* 139 Mich.App. 721, 363 N.W.2d 20 (1984) (per curiam), that a plaintiff claiming unlawful retaliation "need only establish a causal link be-

tween participation in protected activity and the adverse employment treatment complained of." 363 N.W.2d at 22. Thus, Booker contends that once he establishes a prima facie case by showing that he made a complaint of racial discrimination, that the employer was aware of the complaint, that the employer considered the complaint as a factor in its employment decision, and that the adverse employment decision occurred subsequent to his complaint, then the case requires a trial on the merits notwithstanding the employer's claimed legitimate reasons for the adverse employment decision.

However, the issue in *Kocenda* was whether or not a trial court erred in failing to instruct a jury on the alternating evidentiary burden in employment discrimination cases. The court held that such was not error, "concluding that where the evidence of retaliation is fairly strong if believed, ... the alternating burden 'pretext' approach need not be used. The trial judge should be allowed sufficient discretion to fashion instructions modeled after the style of the standard instructions where it is deemed useful to do so." *Kocenda*, 363 N.W.2d at 22. However, there is a distinct difference in whether a court can employ a shifting burden analysis in considering whether or not a plaintiff has sufficiently stated a claim and whether the court must give the precise *McDonnell Douglas* analysis to the jury in its instructions.

We recently addressed this issue in *Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004 (6th Cir.1987). In *Kitchen*, the defendants contended that the district court erred in failing to give the shifting burden analysis of *McDonnell Douglas* with respect to an Elliott–Larsen retaliation claim. Noting first that "the Michigan courts view the *McDonnell Douglas-Burdine* analysis as persuasive in resolving claims brought pursuant to the Elliott–Larsen Act," *id.* at 1012, this court recognized that it is proper to use the shifting burdens analysis in considering whether a party has stated an Elliott–Larsen claim. We further held that even though the shifting burden analysis is proper in considering an Elliott–Larsen claim, a trial court is not required to give the exact *McDonnell Douglas* analysis to the jury in its instructions.

The ultimate question before the jury on this claim was whether the appellants had retaliated against Kitchen for seeking legal relief for discriminatory conduct. The jury was instructed that Kitchen had to prove by a preponderance of the evidence that she was retaliated against for bringing sex discrimination charges. The fact that the court did not instruct the jury on the shifting burdens of *Burdine* is not erroneous because the jury's proper concern was with the ultimate question of retaliation and not with the potentially confusing shifting of evidentiary burdens.

*Id.* at 1012. *See Lewis v. Sears, Roebuck & Co.*, 845 F.2d 624, 634 (6th Cir.1988). Thus, it is clear that while a trial court is not required to give a precise recitation of *McDonnell Douglas* in its charge to a jury, it is not error, and indeed it is proper, for the court to employ that analysis in considering whether or not a claim should go to the jury in the first place. *See Clark v. Uniroyal Corp.*, 119 Mich.App. 820, 327 N.W.2d 372, 374–75 (1982); *see also Gallaway v. Chrysler Corp.*, 105 Mich.App. 1, 306 N.W.2d 368, 371 (1981); *Taylor v. General Motors Corp.*, 826 F.2d 452, 456 (6th Cir.1987) (shifting burden analysis is appropriate in case alleging retaliation for filing a workers' compensation claim).

### C.

Before we consider Booker's contention that his letter of August 26, 1985, was a significant factor in his subsequent demotion, it must first be determined whether the writing of the letter constitutes the type of activity protected by Elliott–Larsen. A review of Michigan law provides little guidance. However, as this court has previously recognized, Elliott–Larsen, which was enacted some ten years subsequent to Title VII, was intended to provide similar protections as those provided in Title VII. *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 617 (6th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). Moreover, Michigan

courts clearly look to Title VII in resolving questions arising under Elliott–Larsen. *See id.; Melchi v. Burns Intern. Sec. Serv., Inc.,* 597 F.Supp. 575, 581 (E.D.Mich. 1984); *see also Michigan Dept. of Civil Rights v. Taylor School Dist.,* 96 Mich. App. 43, 44, 292 N.W.2d 161, 162 (1980); *Michigan Civil Rights Comm'n v. Chrysler Corp.,* 80 Mich.App. 368, 372, 263 N.W. 2d 376, 380 n. 4 (1977). Since section 37.2701 clearly tracks section 704(a) of Title VII, 42 U.S.C. § 2000e–3, we conclude that section 37.2701 should be construed in the same manner.

 As with Title VII, Elliott–Larsen prohibits retaliatory conduct by an employer in two situations: (1) when an employee "has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding or hearing under [Elliott–Larsen]," the participation clause; or (2) when an employee "has opposed a violation of [Elliott–Larsen]," the opposition clause. Booker contends that his letter of August 25, 1985, constitutes a "charge" or "complaint" sufficient to invoke the protections of the Act. We disagree.

 The distinction between employee activities protected by the participation clause and those protected by the opposition clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings. The "exceptionally broad protection" of the participation clause extends to persons who have "participated in any manner" in Title VII proceedings. *Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998, 1006 (5th Cir.1969). Protection is not lost if the employee is wrong on the merits of the charge, *Womack v. Munson,* 619 F.2d 1292, 1298 (8th Cir.1980), *cert. denied,* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981), nor is protection lost if the contents of the charge are malicious and defamatory as well as wrong. *Pettway,* 411 F.2d at 1007. Thus, once the activity in question is found to be within the scope of the participation clause, the employee is generally protected from retaliation. However, the fact an employee files a complaint or a charge does not cre-

ate any right on the part of the employee "to miss work, fail to perform assigned work, or leave work without notice," *Brown v. Ralston Purina Co.,* 557 F.2d 570, 572 (6th Cir.1977), unless absence from work is necessitated by proceedings that occur subsequent to the filing of a complaint or charge. Still, while the absence may be excused, the employee is generally required to provide notice to his employer that the reason for his absence is a proceeding recognized by the Act.

 On the other hand, " 'the opposition clause' [citation omitted] does not protect all 'opposition' activity." *Holden v. Owens–Illinois, Inc.,* 793 F.2d 745, 751 (6th Cir.), *cert. denied,* 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 704 (1986). Courts are required "to balance the purpose of the Act to protect persons engaging reasonably in activities opposing ... discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.... The requirements of the job and the tolerable limits of conduct in a particular setting must be explored." *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222, 231 (1st Cir. 1976); *see also Mozee v. Jeffboat, Inc.,* 746 F.2d 365, 374 (7th Cir.1984). "There may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed. In such a case, his conduct, or form of opposition, is not covered...." *Rosser v. Laborers' Intern. Union,* 616 F.2d 221, 223 (5th Cir.), *cert. denied,* 449 U.S. 886, 101 S.Ct. 241, 66 L.Ed.2d 112 (1980). An employee is not protected when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals. *Unt v. Aerospace Corp.,* 765 F.2d 1440, 1446 (9th Cir.1985).

 While the means of opposition have been narrowly construed, the lawfulness of the employment practice has been broadly construed. A person opposing an apparently discriminatory practice does not

bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful. *See Love v. RE/MAX of Am., Inc.,* 738 F.2d 383, 385 (10th Cir.1984); *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.,* 685 F.2d 1149, 1157 (9th Cir.1982); *DeAnda v. St. Joseph Hosp.,* 671 F.2d 850, 853 n. 2 (5th Cir.1982); *Rucker v. Higher Educ. Aids Bd.,* 669 F.2d 1179, 1182 (7th Cir.1982); *Croushorn v. Board of Trustees,* 518 F.Supp. 9, 25 (M.D.Tenn.1980).

Thus, to determine this court's scope of review of the employer's action, it must first be determined whether the activity the employee engaged in falls within the "participation" clause or the "opposition" clause. In our view, the language of the statute should be read literally, and, therefore, the instigation of proceedings leading to the filing of a complaint or a charge, including "a visit to a government agency to inquire about filing a charge," *Polk,* 801 F.2d at 200, is a prerequisite to protection under the participation clause.[3]

The purpose of the statute is to protect access to the machinery available to seek redress for civil rights violations and to protect the operation of that machinery once it has been engaged. Accordingly, any activity by the employee prior to the instigation of statutory proceedings is to be considered pursuant to the opposition clause. In this case, since there is no evidence that proceedings were instigated prior to Booker's letter, he cannot seek protection under the participation clause. Booker contends that his letter constituted a charge or complaint in that it was sent to Brown & Williamson's Human Resources Officer. However, internal correspondence with one's employer does not sufficiently invoke the statutory machinery available under Elliott–Larsen to constitute the filing

of a complaint or a charge. Thus, Booker's letter is protected only if it falls within the opposition clause.

An examination of the letter indicates that it is not in opposition to a violation of the Act. Booker was not contesting any unlawful employment practice; he was contesting the correctness of a decision made by his employer. Booker generally attempts to dispute the employer's position with regard to his managerial style, and he suggests that the focus of the company's inquiry should be on his supervisor, Pavona.

There are only two possible allegations in the letter that suggest Booker may have been contesting an unlawful employment practice. Booker suggests that Pavona may be a racist due to a statement he allegedly made. However, the allegation is not that Brown & Williamson is engaging in unlawful employment practice, but that one of its employees has a racial intolerance.

The only other possible suggestion of opposition is when Booker alleges that the charges against him are a result of "ethnocism."[4] Assuming that Booker intended discrimination, we hold that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice. An employee may not invoke the protections of the Act by making a vague charge of discrimination. Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination. In our view, such would constitute an intolerable intrusion into the workplace. Thus, since Booker's letter of August 26, 1985,

---

3. It was suggested in *dicta* in this court's holding in *Polk* that merely threatening to file a charge is "protected activity." 801 F.2d at 200. However, we are of the view that merely threatening to file a charge should not be construed under the participation clause. To do so would blur the distinction between opposition to unlawful practices and participation in proceedings. Thus, threats to institute proceedings

should be considered under the balancing approach of the opposition clause.

4. We are unfamiliar with the term "ethnocism" and have been unable to locate it in any dictionary. However, the archaic term "ethnicism" is defined as "paganism" or "heathenism." *See Webster's Third New International Dictionary* 781 (1981) (unabridged).

does not fall under either the participation or opposition clauses, he has failed to state a cause of action.

### D.

Assuming, *arguendo*, that Booker did state a cause of action under the statute, he has failed to establish that his opposition or participation constituted a significant factor in his demotion. As indicated above, Booker was warned that he would be terminated or demoted unless he significantly improved his managerial style. Despite this warning, he continued to act in the same manner toward his subordinates and his customers. While Brown & Williamson acknowledges that the letter was one of the factors in the decision to demote Booker, there is simply no evidence in the record that Booker's vague reference to "ethnocism" in his letter had anything to do with his demotion, nor is there any evidence that the letter was viewed as opposing an unlawful employment practice. On the contrary, Brown & Williamson contends that the letter simply confirmed that Booker was unwilling to accept responsibility for his actions or change his management style as requested. In our view, it was not improper for Brown & Williamson to consider the letter in that manner. *See Jefferies v. Harris County Community Action Assoc.*, 615 F.2d 1025, 1036 (5th Cir.1980) (Even where an employer wrongly believes an employee has violated Company policy, it does not discriminate in violation of Title VII.).

Moreover, Booker has made no attempt to establish that the justifications proffered by Brown & Williamson for his demotion are pretextual. Pretext is established "by either a direct showing that a discriminatory reason motivated the employer or by showing that the proffered reason is not worthy of credence." *Sisson v. Board of Regents*, 174 Mich.App. 742, 436 N.W.2d 747, 750 (1989). As the district court noted, Booker was not demoted until a month after his letter, during which time his employer received what it considered to be an inappropriate separation report concerning Beale and a significant complaint from one of Booker's major customers.

Booker's sole response is that summary judgment is precluded by the fact that his allegation of "ethnocism" occurred prior to his demotion. However, the mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim. *See Polk*, 801 F.2d at 197; *Cooper v. City of North Olmstead*, 795 F.2d 1265, 1272 (6th Cir.1986). In light of the intervening events occurring subsequent to Booker's letter, the mere fact that his discharge occurred after a claim of discrimination is, in and of itself, insufficient to avoid summary judgment. Since Booker has failed to set forth any evidence to rebut Brown & Williamson's legitimate and non-discriminatory reasons for his demotion, we hold that the district court properly entered summary judgment.

### III.

Accordingly, for the reasons stated, the judgment of the district court is AFFIRMED.

DAVID A. NELSON, Circuit Judge, concurring.

I concur in the judgment of the court and in all of the opinion except Part II C. My initial impression is that Mr. Booker may have "opposed" what he construed as conduct that would have constituted an Elliott–Larsen violation, but whether he did or not, I would affirm the judgment of the court for the reasons set forth in the balance of Judge Milburn's very thorough and well-reasoned opinion.