Marlon PRIMES, Plaintiff,

v.

Janet RENO, Defendant.

No. 1:97–CV–0632.

United States District Court,
N.D. Ohio,
Eastern Division.

March 19, 1998.

Edward L. Gilbert, Law Offices of Edward L. Gilbert, Akron, OH, for Marlon A. Primes.

Ann Gulyassy, Daniel Bensing, Department of Justice, Civil Division, Washington, DC, Frank W. Hunger, Department of Justice, Torts Branch Civil Division, Washington, DC, for Janet Reno.

## MEMORANDUM DECISION

GWIN, District Judge.

On February 4, 1998, Plaintiff Marlon Primes filed a motion for partial summary judgment on his retaliation claim in this discrimination in employment action [Doc. 37].

On the same day the Defendant United States Attorney's Office for the Northern District of Ohio filed a cross-motion for summary judgment on all claims [Doc. 39]. For the reasons which follow, the Court grants the defendant's motion, denies the plaintiff's motion, and dismisses the suit.

I

Primes alleges that he was the victim of race discrimination and retaliation in connection with his 1994 performance appraisal. He also complains about another attorney's "harassment" in connection with reviewing his briefs.[1]

Primes's complaints are limited to those presented to the EEO office of the Executive Office of United States Attorneys. That EEO office accepted for administrative review a "Statement of Issues" prepared in response to plaintiff's formal EEO complaint. This defines the scope of his claims in this civil action.[2] These issues make up two principal claims: (1) management allegedly "harassed" plaintiff in connection with the review of his appellate filings in 1994; and (2) management discriminated against plaintiff by providing an unfair performance evaluation for calendar year 1994.[3]

The defendant hired Primes as an Assistant United States Attorney (AUSA) in 1992. The parties disagree on the exact date of the appointment, and when Primes's probation in the office was set to expire, but the Court does not find those discrepancies material in this litigation.

---

1. Plaintiff recently dropped his gender discrimination claim.

2. *See Kizas v. Webster,* 707 F.2d 524, 544–45 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984) (opinion by Ginsburg, J.); *Miller v. United States,* 603 F.Supp. 1244, 1246–48 (D.D.C.1985); *Woolery v. Brady,* 741 F.Supp. 667, 669–70 (E.D.Mich.1990) (plaintiff cannot support promotion claim with allegation that performance appraisals were discriminatory where did not timely challenge performance appraisal) (each alleged performance appraisal must itself be timely challenged).

3. Defendant says this definition of plaintiff's claims is confirmed and narrowed by plaintiff's supplemental response to defendant's interrogatories. They asked plaintiff to "identify and describe each and every act" of race discrimination and reprisal. Plaintiff's supplemental response effectively limits his claims to his 1994 performance appraisal:

    Plaintiff was discriminated against with regard to the criteria applied in his March 1995 progress evaluation [for the 1994 calendar year] with Civil Chief Marcia Johnson. Improperly applied criteria include the use of his free time, keeping the door to his office closed and the extent of his involvement in staff meetings.

During 1994, plaintiff was a junior AUSA in the Northern District of Ohio office and had very limited litigation experience. Plaintiff is an African–American male whose first full year performance evaluation was for calendar year 1993. Plaintiff graduated from Georgetown University Law Center in May of 1989. Plaintiff's first civil trial with the United States Attorney's Office was in November 1993. Plaintiff did not try any cases in 1994. Plaintiff's first appellate argument was in 1994.

Defendant says plaintiff was properly rated as "fully successful" in 1994.[4] During 1994, plaintiff was rated on the basis of a work plan which contained six essential elements. Plaintiff was rated "excellent" on the job element "manages caseload assignments" and was rated "fully successful" on the balance of the job elements. Plaintiff's overall performance evaluation for calendar year 1994 was "fully successful."

Marcia Johnson, Primes's supervisor in 1994, said in a declaration submitted to oppose plaintiff's motion that she assigned plaintiff a "fully successful" rating in his 1994 overall performance evaluation for the following reasons: (1) as a relatively junior AUSA, plaintiff was not assigned the most difficult and complex cases; (2) the civil chief had identified several mistakes in plaintiff's district court and appellate court briefs during 1994; (3) the civil chief had identified significant deficiencies in plaintiff's legal analysis and general approach to his cases; (4) plaintiff did not make sufficient efforts to interact with colleagues in order to promote his professional development; and (5) the fact that plaintiff was handling a lighter-than-average caseload and complained about being overworked lead the civil chief to believe that he was not progressing in his professional development as an AUSA.

The defendant assigned AUSA Michael Anne Johnson as a mentor to plaintiff during the beginning of Primes's term with the defendant. After Emily Sweeney's appointment as United States Attorney, the defendant assigned Michael Anne Johnson responsibility for reviewing appellate briefs. According to Primes, Michael Anne Johnson often treated Primes in what he characterized as "an abusive, unprofessional and chastising manner" by yelling and pointing at him.

Plaintiff's "progress review" for 1994 occurred on September 28, 1994. On October 3, 1994, Primes filed his first written "informal" complaint of discrimination with the EEO Office of the Executive Office of United States Attorneys in Washington, D.C. On April 19, 1995, plaintiff filed his first written "formal" complaint of discrimination with that same EEO office.

Defendant says that Primes's supervisor, Marcia Johnson, did not learn that plaintiff had initiated an informal EEO complaint until after she completed his 1994 performance evaluation on March 3, 1995.

## II

Review of summary judgment motions is controlled by Fed.R.Civ.P. 56(c), which provides in part that

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is not proper if there is a material dispute over the facts, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate, however, if the opposing party fails to make a

---

4. During the 1994 evaluation period the defendant used five possible ratings: unacceptable, minimally satisfactory, fully successful, excellent, and outstanding. (Those ratings changed as of fiscal year 1996 to: fails to meet expectations, meets expectations, and substantially exceeds expectations.)

showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit has recognized that *Liberty Lobby, Celotex* and *Matsushita* effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir.1989). In responding to a proper motion for summary judgment, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* at 1479 (*quoting Liberty Lobby,* 477 U.S. at 257.) The nonmoving party must introduce more than a scintilla of evidence to overcome the summary judgment motion. *Street,* 886 F.2d at 1479. It is also not sufficient for the nonmoving party merely to "show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street,* 886 F.2d at 1479. That is, the nonmoving party has an affirmative duty to direct the court's attention to specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

In *Mitchell v. Toledo Hosp.,* 964 F.2d 577 (6th Cir.1992), the Sixth Circuit emphasized the showing required to defeat summary judgment.

The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict ...

The "mere possibility" of a factual dispute is not enough. Rather, in order to defeat summary judgment a plaintiff "must come forward with more persuasive evidence to support [his or her] claim than would otherwise be necessary." Where the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted. 964 F.2d at 581–82 (citations omitted).

Accordingly, viewing the evidence in the light most favorable to the nonmoving party, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* supra at 251–52.

### III

Title VII of the 1964 Civil Rights Act prohibits employment discrimination on the basis of race. 42 U.S.C. § 2000e–2. Section 717 of Title VII, added by section 11 of the Equal Employment Opportunity Act of 1972, extends the statute's protection to federal employees, including "employees ... in executive agencies as defined in section 105 of Title 5." 42 U.S.C. § 2000e–16. *See Kizas v. Webster,* 707 F.2d 524, 541 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). An AUSA such as plaintiff is an employee of the Department of Justice and is covered by Title VII.

█ Here, the plaintiff claims there is direct evidence of discrimination, especially regarding the retaliation claim. The evidence plaintiff cites consists of conclusory statements in depositions and opinion testimony from some workers in the defendant's office. These statements and opinions fall far short of showing direct evidence of racial discrimination or a retaliatory atmosphere.

Having no direct evidence of discrimination, the plaintiff must make the showing described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In *Kline v. Tennessee Valley Auth.,* 128 F.3d 337 (6th Cir.1997), the

Sixth Circuit described the showing required under *McDonnell Douglas:*

> When a plaintiff attempts to establish its case using the *McDonnell Douglas–Burdine* paradigm, the evidence which establishes the *prima facie* case is extremely important. In order to prove a *prima facie* case of discrimination, a plaintiff must show: 1) that he is a member of a protected group, 2) that he was subject to an adverse employment decision, 3) that he was qualified for the position, and 4) that he was replaced by a person outside of the protected class.

*Kline,* 128 F.3d at 349 (citations omitted).

In disparate treatment cases, the plaintiff can make a *prima facie* claim of discrimination by showing that the defendant treated a non-protected person *similarly-situated* differently. To make this showing, plaintiff needs to show that the persons he is being compared with were so situated as to be in a very similar situation. The *Mitchell* court described this:

> As the Sixth Circuit has frequently phrased the requirements of a *prima facie* claim of disparate treatment using such a "comparable non-protected person was treated better" element as one of the requisites, the plaintiff must produce evidence which at a minimum establishes (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees. . . .
>
> . . .
>
> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly-situated *in all respects.* Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Id.* at 582–83 (citations omitted).

The *McDonnell Douglas* framework consists of three stages. At the first stage, the plaintiff must establish a *prima facie* case that the employer discriminated against him. Second, the employer can produce evidence of a legitimate, nondiscriminatory reason for its action. Finally, the plaintiff attempts to discredit the employer by proving that the employer's reason was a pretext for discrimination. *Id.* at 342.

A *prima facie* case requires the employer to go forward with evidence of a nondiscriminatory intent. The *prima facie* case creates a presumption that discrimination was the real motive for the employment action. In *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) the Court explained this:

> [W]e are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race. 438 U.S. at 577.

Since the *prima facie* case creates a presumption of discrimination, if the employer fails to respond to the *prima facie* case and if the trier of fact believes the plaintiff's *prima facie* evidence, then the plaintiff will receive judgment. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Disbelief of the defendant's proffered reasons does not compel a court to enter judgment for the plaintiff. *Id.; Kline,* 128 F.3d at 343–44, 347 ("will permit" a finding of discrimination) (*Hicks* adopts "permissive pretext" approach rather than Sixth Circuit's "pretext plus" approach to earlier employment discrimination analysis). Only the burden of production shifts to the employer. At no time does the defendant need to persuade the trier of fact that

"it was actually motivated by the proffered reasons."[5]

The Title VII plaintiff here always carries the burden of persuasion. *Hicks*, 509 U.S. at 511. The burden of production shifts back to the plaintiff, if the defendant proffered reasons, and the plaintiff must persuade the trier of fact that the employer's articulated reasons are a "pretext." *Kline*, 128 F.3d at 342. Any presumption generated by the *prima facie* case drops out of the case. *Hicks*, 509 U.S. at 510–11.

██ To prove that defendants's reasons are pretextual, the plaintiff must show that the reasons have no basis in fact, that the reasons did not in fact motivate the discharge or, if they were factors in the defendant's decision, that they were jointly insufficient to motivate the discharge. *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 266 (6th Cir.1986) (showing pretext in age discrimination suit), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987).

## IV

██ Clearly Plaintiff Primes as an African American is a member of a class protected under Title VII. Both parties apparently concede that a poor performance appraisal, which affects an employee's subsequent raise, could be considered an adverse employment action. The parties disagree on whether Primes satisfies the other prongs of establishing a *prima facie* case.

Primes must show that he was qualified for the higher performance rating he sought. Marcia Johnson, the chief of the civil division at the time of these events, testified that she had to prepare an annual performance evaluation for all the AUSAs assigned to the civil division.

> Performance Evaluations are prepared annually to review the performance of AUSAs (and support staff) against the critical elements of their Performance Work Plans and to identify any areas for growth or improvement. At the approximate midpoint in the annual Performance Evalua-

tion cycle, employees are given a Progress Review. In preparing Progress Reviews and Performance Evaluations, I solicited input from Mr. French and James Bickett in their capacities as supervisors and/or coordinators of high volume units, and from Michael Anne Johnson in her capacity as appellate reviewer and coordinator of a high-volume unit.

Marcia Johnson too is an African American, but the fact both she and the plaintiff are minorities is not dispositive of Primes's claim of racial discrimination.

The evidence shows that in 1994 plaintiff did not work on complex or difficult cases. Primes was not assigned to work on any medical malpractice case, on any cases seeking emergency injunctive relief, or on any cases seeking class certification during 1994. As of July 1994, Primes was assigned 14 active cases on his personal docket. The average for all civil attorneys in the Northern District of Ohio as of July 1994 was 28 active cases. Primes prepared and filed 13 appellate briefs that year, but seven were in social security cases, and three were in response to claims by one *pro se* plaintiff. (Three other attorneys assigned to the social security unit in the defendant's office also prepared six social security appellate briefs in 1994.)

Defendant also says that plaintiff, like other AUSAs in the civil division, was not rated on the basis of how many cases he won or lost, but rather on the basis of the quality of this work in light of the complexity of his case assignments.

The Court finds that this evidence stops the plaintiff from establishing that he was qualified for a higher evaluation, especially when considered alongside Primes's difficulty in satisfying the remainder of his *prima facie* case.

Defendant comes forward with statistical evidence which precludes Primes's ability to show "that for the same or similar conduct he was treated differently than similarly-situated non-minority employees."

---

**5.** *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

From November 1, 1988, through 1997, the civil division in the Northern District of Ohio hired (or saw transferred in) 12 AUSAs. Of these 12 newly-hired AUSAs, records for one who has left the government or gone to work for another U.S. attorney's office were not available. Another AUSA transferred to the civil division after six years experience as an AUSA in another division. A third AUSA joined the office with 10 years of experience and was soon promoted to a supervisory position.

About half of the remaining nine attorneys received a "fully successful" rating during their second full year with the Northern District, that was their same rating their first year, and most of these lawyers were white. (Second year ratings were not complete or available for a few others.) A similarly situated attorney who is not a minority was rated on a new scale in his second year evaluation and received a grade that the Court assumes is equivalent to the former "fully successful" grade. (Of the two AUSAs who received an "excellent" rating during the second year, one was white and the other was African–American.) [6]

In summary, the defendant treated plaintiff the same as at least four similarly-situated AUSAs when Primes was rated "fully successful" during his second year with the civil division. One black male and one white male were rated higher but at least four others received the same rating. Plaintiff's claim that he received "the lowest overall evaluation of any attorney in the entire Civil Division" did not state that this same rating was given to the broad majority of second year attorneys.

Essentially plaintiff argues that he was a better lawyer than some of his colleagues because his legal work for the federal government saved his client more money. He says that he was more successful than some similarly situated AUSAs because they botched cases and cost the government money, but these accusations are in the nature of conclusory statements without evidentiary support. However, the defendant introduced evidence that win-loss ratios and the monetary amounts of settlements did not carry dispositive weight in employee evaluations. Primes, though, says that because he received an evaluation that did not reflect a higher rating, he was the victim of racial discrimination. This is not the law. *See Miller v. United States,* 603 F.Supp. 1244, 1248 n. 13 (D.D.C.1985) (mere fact black deputy U.S. Marshals denied certain promotions and opportunities not sufficient to state *prima facie* case of race discrimination).

The Court finds that Primes has not satisfied the fourth prong necessary to establish his *prima facie* disparate impact discrimination claim.

■ The charge of racial discrimination based on another attorney's harassing Primes over his appellate briefs also is without merit. In his deposition and in answers to interrogatories, plaintiff alleges that Michael Anne Johnson kept copies of her edits of his appellate filings to determine if plaintiff made copies of her changes and, if not, she would bring his failure to do so to the attention of the chief of the civil division. Primes also alleged that Michael Anne Johnson corrected matters in plaintiff's briefs that she had approved in boilerplate language appearing in other attorney's briefs. She "yell[ed] and point[ed] her finger" at plaintiff during interactions. She also directed plaintiff to delete references to unpublished decisions in an appellate brief.

Several white attorneys in the Northern District of Ohio's civil division testified during the EEO investigation of the plaintiff's "harassment" claim that Michael Anne Johnson made extensive editorial changes on their appellate filings.

Whether characterized as unprofessional conduct attributed to the defendant, or plaintiff's petty complaints about office routines, the Court finds that defendant's treatment of plaintiff's appellate briefs does not constitute an "adverse employment action," let alone racial discrimination. *See Wilson–Simmons*

---

**6.** Because of the sensitive nature of this evidence of performance evaluations of the AUSAs in question, the Court granted defendant leave to file this declaration and its one page attachment under seal.

*v. Lake Co. Sheriff's Dept.,* 982 F.Supp. 496, 503 (N.D.Ohio 1997) (supervisor's internal requests to explain use of white-out in the log or whether doors had been secured are not "adverse employment actions" and such requests do not constitute discipline).

■ The evaluation also criticized Primes for his "loner" image in the office, particularly keeping his office door shut. None of the other attorneys who testified reported being criticized for closing their door, but this fact alone does not establish Primes's *prima facie* case.

The Court also does not believe that the supervisor's observations about the plaintiff's interactions with his colleagues are a pretext for discrimination. Subjective employment evaluations are a legitimate factor for employers to consider, even if the evaluation covers negative factors such as personality deficiencies and negative attitudes that would detract from a person's abilities. *Johnson v. U.S. DHHS,* No. 88CV–2383, 1992 WL 675943 * 19 at ¶ 53 (N.D.Ohio Sept.17, 1992), *aff'd,* 30 F.3d 45 (6th Cir.1994) (citations omitted).

Counsel says that plaintiff "broke civil division records by successfully completing a large number [sic] appellate briefs and jury trials in close proximity to one another in 1994,.[sic] 1996 and 1997." Plaintiff's counsel furnishes no evidence to rebut the information the defendant produces, which shows Primes was a junior attorney with a moderate workload in 1994. There is no evidence that Primes deserved a different performance evaluation.

The Court finds that Plaintiff Primes has not made out a *prima facie* case that defendant discriminated against him in 1994 on the basis of his race. Assuming in the alternative that Primes did make out a *prima facie* case of racial discrimination, the Court also finds that defendant provided ample reasons to show Primes's performance evaluation rating of fully satisfactory was a legitimate finding and not the result of any racial animus.

## V

It is an unlawful employment practice to discriminate against an employee for making a charge of discrimination. 42 U.S.C. § 2000e–3(a). Section 2000e–3(a) provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Section 2000e– 2(a)(1) defines an "unlawful employment practice" as an "action by an employer that discriminates against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."

■ To make out a *prima facie* case of retaliation under Title VII, it must be shown:

(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir. 1987), *cert. denied,* 484 U.S. 1067, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988). If plaintiff establishes a *prima facie* case of retaliatory treatment, and the defendant meets its burden of establishing a legitimate reason for its conduct, then plaintiff must produce direct, indirect or circumstantial evidence that the defendant's treatment of the plaintiff was the result of a retaliatory motive. *Canitia v. Yellow Freight System, Inc.,* 903 F.2d 1064, 1067 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990).

Plaintiff has difficulty in trying to establish a *prima facie* case of retaliation. Defendant maintains that Marcia Johnson did not know of Primes's "informal" EEO complaint (filed with the EEO Office in Washington) until after she completed the rating in question. The undisputed facts show that plaintiff received his mid-year progress review on September 28, 1994, and received his final performance evaluation for 1994 on March 3,

1995. Plaintiff initiated his first informal EEO complaint on October 3, 1994. Defendant says there is no evidence that Marcia Johnson knew of that informal complaint prior to the alleged act of reprisal (the completion of the 1994 performance evaluation on March 3, 1995).[7]

■ Plaintiff's primary argument in support of his request for summary judgment is that Marcia Johnson attempted to discharge him immediately after she learned that he had filed a discrimination complaint.

The testimony of Alan Preston, the deputy director of administration of the U.S. Attorney's office and the person plaintiff first contacted about his complaints, may support this inference. Preston described for the EEO investigator his conversation with Marcia Johnson after Preston told her of plaintiff's first complaints:

Q: So did you talk to Marcia Johnson?

A: Yes. I talked to Marcia after the meeting, and at that point, she raised concerns about Marlon functioning as an AUSA, and she brought up the possibility of the probation ending at that point.

\* \* \* \* \* \*

Q: Okay. So she brought up the probationary period?

A: Right. And at the present time, we thought it was October 18th, 1994.

That would be the end of his probationary period.

\* \* \* \* \* \* .

Q: Okay. Any action taken there?

A: No.

Q: So after you investigated and told her that was the probationary end, did she comment at all?

A: No. She did not, and I don't recall any comments about that.

Preston recounted that conversation later on and noted that he asked Marcia Johnson whether plaintiff's performance was unsatisfactory and, in response, she "indicated at that time it was not unsatisfactory."

This evidence falls far short of retaliation. A supervisor inquired about an employee's probationary status and speculated about the employee's ability to function, but on reflection concluded that his performance was acceptable. No formal proposal to remove was issued, nor did anyone even discuss taking such a step. Also, there is testimony that French asked Primes during a meeting in September or October 1994 whether he felt he was being discriminated against because of his race, and Primes said no.

In *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304 (6th Cir.1989), the Sixth Circuit analyzed the type of employee conduct sufficient to trigger the "opposition clause" of Title VII.[8] *Booker* held "that a vague charge of discrimination in an internal

7. In her declaration filed in support of the defendant's summary judgment motion, Marcia Johnson says in part:

14. Because of plaintiff's dissatisfaction with his Progress Review, I scheduled a subsequent meeting with plaintiff and my Deputy Chief, Richard French, for October 12, 1994. At that meeting, I described the deficiencies that I had observed in plaintiff's performance thus far in the 1994 rating period. I specifically pointed out that briefs had been filed with typographical errors, the flaws in Mr. Primes' legal analysis of a tort case, that he had failed to prepare a mandatory disclosure statement in the [x] case, that he intended to prematurely identify an expert in [x] and that his response to interrogatories was not timely in [x]. I had made many of the same criticisms of plaintiff's performance a [sic] the Progress Review a few weeks earlier.

15. ˙At no time during that meeting did plaintiff inform me or Mr. French that he had filed an

"informal" Equal Employment Opportunity ("EEO") complaint about his 1994 Progress Review. . . .

16. Plaintiff's 1994 rating period closed on December 31, 1994. I prepared plaintiff's Performance Evaluation on or about February 3, 1995, and provided it to plaintiff on March 3, 1995. . . .

17. I did not learn that plaintiff had filed an informal EEO complaint in connection with his 1994 Performance Evaluation until March 15, 1995, when I was contacted by an EEO counselor who informed me of plaintiff's informal EEO complaint.

8. "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, ..." 42 U.S.C.2000e–3(a).

letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." *Id.* at 1313. Like the plaintiff in *Booker*, plaintiff here offered vague suggestions of racism as one possible explanation of what he perceived as a poor evaluation, but this is not sufficient to constitute "opposition" under Title VII and cannot form the basis for a retaliation claim.

Defendant also says that even if its management was on notice of Primes's protected activity prior to the final performance evaluation, an inference of retaliation does not arise. Plaintiff cannot point to any material change in his performance evaluation from the date of the progress review in September 1994 to the close of the rating period at the end of 1994.

The Court recognizes a factual dispute whether the defendant was on notice that plaintiff planned to pursue a discrimination charge. Attorney Preston, the defendant's deputy director of administration, testified that after speaking with Primes and learning of the plaintiff's wish to file a charge, he (Preston) then spoke with Primes's supervisor and other supervisory people in the U.S. Attorney's office. As these motions before the Court request summary judgment, the Court cannot weigh the evidence or determine the credibility of the witnesses. Instead, the Court finds that any conflict over who knew about Primes's possible plans to contact and/or pursue an EEO complaint in the fall of 1994 and the winter of 1995 is immaterial.

Because the final evaluation was based on the same problems the civil chief identified in the progress review six month earlier, these facts cannot support an inference of retaliation. The plaintiff in a retaliation case must establish that the adverse employment action complained of would not have occurred *"but for"* plaintiff's protected activity. *Canitia*, 903 F.2d at 1068. *Canitia* affirmed summary judgment for defendant on plaintiff's retaliation claim where plaintiff's performance deficiencies before and after his protected activity not only negated the "causal connection" element of his *prima facie* case but constituted an unrebutted, legitimate reason for his discharge. *Id.* at 1066. Here,

there was no change in Primes's expected rating and plaintiff has no valid claim of retaliation.

### VI

For the reasons outlined above, the Court denies the plaintiff's motion for partial summary judgment, denies the plaintiff's motion to strike defendant's motion, and grants the defendant summary judgment on all claims.

IT IS SO ORDERED.