Mary Lou BURNS, Plaintiff,

v.

REPUBLIC SAVINGS BANK,
et al., Defendants.

No. 1:95 CV 0120.

United States District Court,
N.D. Ohio,
Eastern Division.

Oct. 23, 1998.

Ellen Constance Spielman, University Heights, OH, Dennis J. Niermann, Law Offices of Dennis J. Nierman & Company, Cleveland, OH, for Plaintiff.

Nicholas D. Satullo, Reminger & Reminger, Cleveland, OH, Jerome F. Weiss, Cleveland, OH, for Defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Mary Lou Burns brings this employment discrimination action pursuant to the Equal Pay Act, 29 U.S.C. § 206, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1101 *et seq.*, against Republic Savings Bank, Republic Bancorp, Inc., and several John Does, alleging that they discriminated against her in the terms and conditions of her employment due to her gender and interfered with her receipt of disability benefits. Burns also brings claims under Ohio antidiscrimination law, Ohio Rev.Code § 4112.99, and brings state common-law claims for wrongful discharge and intentional infliction of emotional distress.

This Court has previously granted summary judgment for the defendants on all claims except Burns' claims for gender discrimination and retaliation under Title VII (counts I and VII). Those claims were tried to the bench on August 4–8, 1997. The parties have filed post-trial briefs. Pursuant to Fed.R.Civ.P. 52(a), this Court now makes the following. findings of fact and conclusions of law.[1]

## I. FINDINGS OF FACT

### A. Background

Horizon Savings Bank [2] was a mutual savings and loan association located in Cleveland. As a mutual savings and loan, it was owned by its depositors. In 1986, Horizon converted from a mutual association to a publicly-traded company. As a result of that process, Horizon's executives became much more susceptible to losing their jobs in a takeover. Horizon wanted to protect its then-current leadership. Accordingly, as part of its conversion into a publicly-traded company, Horizon entered into employment agreements with its president, Lynn Fritzsche, and its three senior vice presidents, Bruce Larkins, Frank Hawkins, and David Moyers. Although the agreements were for definite terms, Horizon kept the agreements "evergreen," by renewing them every year. As a result, the contracts never expired.

These agreements also included a change of control provision, i.e., they provided that in the event of a takeover which was not approved by a unanimous vote of the board of directors, Fritzsche would receive five years of severance pay, while Larkins, Hawkins, and Moyers each would receive three years of severance pay.[3] These agreements were disclosed in the offering circular for the public offering.

### B. Burns' Hiring

In November of 1988, Horizon hired Burns as its marketing manager, which was a new position at Horizon. As marketing manager, Burns was charged with changing Horizon's culture from a more passive, banking-oriented culture to a more aggressive, sales-oriented culture. Burns' initial salary was $34,000 per year.

Burns' initial reviews were positive, and Horizon gradually increased her responsibilities, her title, and her salary. During 1989, Horizon decided to shift responsibility for the branches from Larkins, the senior vice president of operations, to Burns, effective in January of 1990. Burns was also appointed to Horizon's steering committee. In January of 1990, Burns was promoted to the position of first vice president. By the end of 1990, Burns' salary was over $42,000 per year.

### C. Stock Options

In 1986, Horizon adopted an employee stock ownership plan and began issuing options to employees. In May of 1989, approximately six months after Burns was hired, she received an award of options as part of a general award of options to employees. Horizon never awarded or offered any options to any employee after that date (although Republic did, see infra), even though there were additional stock options available for distribution under the option plan. Horizon stopped issuing options because such awards diluted the investments of the existing shareholders, who were beginning to complain about management's benefits. In addition, from 1989 on, Horizon was sporadically engaged in discussions regarding potential mergers or acquisitions, and the board believed it would be inappropriate to issue options under those circumstances.

### D. Branch Managers

As part of its transformation from a banking culture to a sales culture, Horizon changed the salary structure of the branch managers. Their base salaries were reduced and Horizon implemented an incentive pro-

---

1. To the extent any findings of fact are incorrectly denominated as conclusions of law, then they should be considered findings of fact. Likewise, to the extent any conclusions of law are incorrectly denominated as findings of fact, they should be considered conclusions of law.

2. Republic is Horizon's successor in interest for purposes of this lawsuit.

3. Such agreements are often colloquially referred to as "golden parachutes."

gram. The reductions in base salary were imposed gradually throughout 1990. As the person responsible for the branches, Burns was responsible for implementing this program. At the time the reductions began, all of the branch managers were women.

In June of 1990, Burns hired a man, Tom Mohorcic, as a branch manager at a salary of $25,000. Although this salary was lower than that of the female branch managers, it was higher than the salary that the female managers would have had after their reductions were complete. Glenn Keeney, the director of personnel for Horizon, noticed the potential discrepancy and brought it to Burns' attention.[4] As a result, the reductions in the female branch managers' salaries were stopped, or slowed, so that the female branch managers continued to have a higher base salary than Mohorcic.

### E. Shareholder Dissension

During this same period of time, shareholders were becoming dissatisfied with Horizon's performance. At the 1990 annual meeting, some of the shareholders (the "Nordruk group") proposed a non-binding resolution urging that the board of directors solicit, review, and negotiate offers to sell Horizon. In support of their proposal, the shareholders argued that management had little or no incentive to change its operating policies because it was entrenched. The proposal specifically criticized the golden parachutes. At the annual meeting, 39 percent of the shareholders voted for the resolution, 29 percent voted against it, and 32 percent abstained, indicating substantial support for Nordruk's position.

Despite this pressure from the shareholders, Horizon's board renewed senior management's employment agreements in November of 1990. The board did so because it believed that it was in the best interests of Horizon to keep its existing management team. The board also believed that, because these employment agreements were disclosed at the time of the initial public offering, it would not be unfair to the shareholders for these agreements to continue.

### F. Burns' Promotion To Senior Vice President

Burns ran into resistance in implementing the new sales culture, which was not popular with the branch staff. In order to give her the necessary "clout" to implement the new policies, Fritzsche suggested promoting Burns to the position of senior vice president. In light of shareholder opposition to the golden parachute provisions, however, Fritzsche proposed that Burns not be given a golden parachute.

Because Burns was the first woman to be promoted to the position of senior vice president, and would be the only senior vice president without a golden parachute, there was some concern that the Board would be asking for a lawsuit if it did not give Burns a golden parachute. The board sought advice on this issue from outside counsel, Sam Pearlman. Pearlman advised the board that, although the issue would never be entirely clear, it would probably be permissible to deny Burns a golden parachute if the board resolved to give no more golden parachutes to anyone, regardless of gender.

In February of 1991, the board essentially followed Pearlman's advice. It promoted Burns to the position of senior vice president of sales and marketing, but did not give her a golden parachute. At the same meeting, the board adopted a policy which provided that the board would not issue any more golden parachutes. In fact, the board never did issue any further golden parachutes. At the time of Burns' promotion, the board increased her salary to $45,217.

The members of the board who testified unanimously maintained that the decision to deny Burns a golden parachute had nothing

---

4. Burns makes much of the fact that Keeney testified that he brought the discrepancy to the attention of Burns and Karen Rhodes. In fact, Rhodes was not employed by Horizon until October of 1990. The Court does not consider this error to be fatal to Keeney's credibility. Keeney testified that he believed that Rhodes was present; he did not state it as a definitive fact. Moreover, Keeney confirmed that he did have these discussions with Burns. In addition, since Keeney was later terminated by Republic, he had no reason to testify favorably on Republic's behalf. This Court finds Keeney credible on this matter.

to do with Burns' gender. Rather, they testified that the reason they did not give Burns a golden parachute was due to the pressure from the shareholders and the shareholders' opposition to golden parachutes. They testified that they would have made the same decision had Burns been a man. Put differently, at least one board member, Dennis Ibold, testified that if he had been told that Burns needed a golden parachute, he would have voted against her promotion, regardless of whether she was a man or a woman.

The board members who testified that Burns' gender was not a motivating factor in the decision not to give her a golden parachute included Dr. Lucille Mayne. Subsequent to Burns' promotion, Mayne resigned from the board in protest over certain decisions. As a result, Mayne stated that she had a personal animus towards the board. She certainly had no incentive to protect Republic or Horizon. For this and other reasons, this Court found Mayne extremely credible on this issue.

Near the time Burns was promoted to senior vice president, Fritzsche conducted Moyers' performance review. Fritzsche told Moyers that he considered Moyers, Larkins, and Hawkins equally valuable, and so he calculated his recommendation to the board for each of their salaries by taking industry surveys and averaging the second, third, and fourth-highest paying positions. Fritzsche did not say that he considered Burns the equal of the other three. In addition, he testified that he did not use this method after Burns was promoted.

### G. KPMG Study

In March of 1991, Horizon hired KPMG/ Peat Marwick ("KPMG") to study its compensation program for senior management. The study included benefits, including the golden parachutes and stock options, as well as salaries. Horizon wanted to ensure that its compensation program was competitive with those of other banks. As chair of the board's compensation committee, Mayne worked with KPMG on the study. John Hauschulz was the principal at KPMG who was responsible for the study.

Initially, the study only encompassed the four male senior officers (Fritzsche, Hawkins, Moyers, and Larkin). Shortly after the study began, however, Mayne instructed Hauschulz to include Burns in the study, since Burns had recently been promoted to senior vice president. Mayne also told Hauschulz that Burns did not have much banking experience.

In conducting the study, KPMG's focus was on comparing positions, duties, and responsibilities of Horizon's senior management to similar positions at other banks, and not the qualifications of the people in those positions. As part of the study, KPMG indicated that it would interview senior management. However, Burns was never interviewed. It is not clear that any of the other senior managers were interviewed.

There is some dispute as to whether KPMG's final study credited Burns with all of her duties. Specifically, the engagement letter sent from Horizon to KPMG did not mention Burns' responsibilities for branch administration. Likewise, the final report indicates that Burns was responsible for marketing, without mentioning her responsibilities in branch operations and lending. It also indicates that Larkins had responsibility for branch administration.

An internal KPMG document, however, indicates that the positions of head of retail banking and officer in charge of bank administration, as well as the position of head of marketing were surveyed in relation to Burns' position. Although Hauschulz could not specifically recall using this information in evaluating Burns' salary, he assumed that it was used. In any case, regardless of whether KPMG properly analyzed Burns' duties or used this information in its report, it is apparent that KPMG had some knowledge of Burns' responsibilities in these areas. Accordingly, this Court does not find that Horizon withheld any information regarding Burns' duties from KPMG.

KPMG provided the results of its study in July of 1991. KPMG's report indicated that the four senior officers other than Larkins were paid less than the marketplace median of comparable employees at other banks, but that Fritzsche and Burns in particular were

underpaid. KPMG's study could not find a marketplace median for Larkins. Specifically, the results were as follows:

| Name | Salary | KPMG Study |
|------|--------|------------|
| Fritzsche | $131,250 | $152,700 |
| Hawkins | $ 72,640 | $ 77,160 |
| Moyers | $ 70,610 | $ 73,500 |
| Larkins | $ 70,610 | $ NA |
| Burns | $ 45,217 | $ 56,300 |

In response to the KPMG study, the board raised the salary of all of Horizon's employees to the marketplace medians identified in the study. Because no figure was available for Larkins, the board gave him the same raise it gave Moyers. These pay increases were retroactive to January 1, 1991.

KPMG also compared the stock options received by senior management to the marketplace median using a "stock option multiple." KPMG found that Fritzsche and the senior vice presidents other than Burns had multiples between 40 and 60 percent. Burns had an "NA" in this category, because she had very few stock options. KPMG also found that the marketplace median for the senior vice presidents, including Burns, was between 40 and 60 percent. It found that the median marketplace for Fritzsche's position was between 60 and 80 percent. Thus, according to this review, only Fritzsche and Burns had fewer stock options than the marketplace median. Neither Fritzsche nor Burns received any additional stock options.

The KPMG study also looked at the golden parachutes. While the golden parachutes for the senior vice presidents other than Burns were competitive with the marketplace median, Fritzsche's golden parachute was more lucrative than the marketplace median. The marketplace median provided for between 2.00 and 2.99 times annual salary in severance pay, while Fritzsche's provided for five years of severance pay. In fact, Fritzsche's golden parachute would subject Fritzsche and Horizon to certain tax consequences because it was over the Internal Revenue Code's limit of 2.99 times annual salary.

Finally, KPMG looked at vacation. KPMG recommended four weeks of vacation for senior management. The board decided to base vacation on experience, however, resulting in Burns receiving less vacation than the other senior vice presidents.

### H. Potential Acquisition Activity

Beginning approximately at the end of 1989, Horizon had asked its investment advisor, McDonald & Company Securities ("McDonald"), to solicit companies which might be interested in acquiring Horizon. In December of 1991, however, the board announced that it was ceasing solicitation of acquisition interest in Horizon. The board did this because the values of bank stocks were depressed, and because Horizon was viewed as "stale."

Although Horizon asked McDonald to stop soliciting offers, Horizon was still receptive to a potential proposal. In fact, in that same month, John Northway, a shareholder of both Horizon and Republic, set up a meeting between Fritzsche and Jerry Campbell of Republic for the purpose of discussing a potential merger. Although Republic eventually purchased Horizon, the purchase did not occur immediately. In fact, Republic made an offer to purchase Horizon in February of 1992, which Horizon did not accept.

### I. Revision To Change Of Control Agreements

In January of 1992, Horizon revised the golden parachutes of the senior officers other than Burns. Prior to this time, the golden parachutes were only activated if Horizon was subject to a hostile takeover. A hostile takeover was defined as one in which the board of directors did not unanimously approve the sale or acquisition. Fritzsche, who was a member of the board, testified that he would have voted against any takeover that did not adequately protect the interests of senior management. His vote would have triggered the golden parachutes.

The revised golden parachutes provided that they were effective upon any takeover, whether hostile or not.[5] In addition, all the golden parachutes were revised to reduce the

---

**5.** The revised contracts state that the board was not actively considering any proposal for a change of ownership or control at this time, which was technically accurate.

severance pay to 2.99 times annual salary, in accordance with the Internal Revenue Code. The revised contracts state that the board was not actively considering any proposal for a change of ownership or control at the time they entered into them. The board took this action despite opposition among the shareholders to the golden parachutes. Board members testified that they took this action because they were concerned that Fritzsche would be forced to vote against any proposed acquisition in order to protect his golden parachute. They wanted to remove any incentive for Fritzsche to make any takeover hostile and to work against a takeover. They had apparently considered such an action for some time, even before Burns was promoted to senior vice president. Before adopting this change, the board had considered and rejected golden parachutes which would be effective only in the event that a takeover was not approved by 60 or 67 percent of the board. In rejecting these proposals and adopting the revised golden parachutes, the board relied at least in part on the advice of counsel, Ed Lublin. Lublin advised them that the tax rules do not distinguish between friendly and hostile takeovers. He also advised them that management would be more likely to cooperate in a takeover if it would get a golden parachute regardless of whether the takeover was hostile or friendly. Finally, he advised them that the FDIC and OTS favored provisions which facilitate changes in control.

## J. Transfer Of CRA Responsibilities

In March of 1992, Horizon transferred responsibility for Community Reinvestment Act ("CRA") compliance to Burns. Moyers had previously handled this work and had apparently not performed well. In fact, Horizon had received a "needs to improve" CRA rating from the government. There were no immediate adjustments to either Moyers' or Burns' salaries as a result of this reassignment of responsibilities. Moyers had not received a raise when he received these responsibilities in 1979. During Burns' tenure, she had to expand the reporting process due to additional government requirements. Burns also had help with CRA duties, howev-

er, since other individuals also had CRA responsibilities.

It was not unheard of for employees at Horizon to acquire additional responsibilities without a corresponding change in compensation. When the company went public in 1986, David Gifford, Horizon's controller, worked on the required registration statements and other government forms. Similarly, his reporting requirements on interest rate risk to the government increased over time. Likewise, Hawkins and Moyers had often been asked to review potential candidates for Horizon to acquire without receiving any additional compensation.

During this time, the lending department, which was the responsibility of Moyers, was having difficulty closing the loans generated by the branches under Burns. This created a backlog and damaged the lending business. The branch staff had to help the lending department close the loans and clear the backlog.

## K. More Shareholder Dissension

In March of 1992, dissident shareholders sent a proposal to the board which would have prohibited Horizon from making payments under any golden parachute agreements without shareholder approval. The board rejected this proposal and decided to oppose it if it should be brought to the shareholders.

Also in March, 1992, dissident shareholders nominated two shareholders to the board who would work actively to sell Horizon. The dissidents strongly criticized the board for failing to sell the company. It also criticized the golden parachutes. Horizon urged the shareholders to reject these nominees. It defended its decision not to sell the company and stated that shareholder maximization would be pursued by going forward independently. It also defended the golden parachutes on the ground that they were necessary to attract and retain qualified executives.

The dissident shareholders prevailed at the annual meeting and their nominees were elected. Fritzsche was one of the two defeated directors. Horizon instituted a law-

suit against the dissident shareholders to set aside the election and prevent the new board members from taking their seats, but that lawsuit was later dropped. In addition, the shareholders approved the proposal to restrict golden parachute payments.

## L. Termination Of Fritzsche And Promotion Of Hawkins And Gifford

In June of 1992, the board (of which Fritzsche was no longer a member) decided to terminate Fritzsche.[6] The board then promoted Hawkins to the position of acting president and gave him a raise as a result of that promotion. The board also appointed Gifford to the position of acting chief financial officer to replace Hawkins, who had been CFO.

Gifford took over all of Hawkins' duties as CFO, except that Hawkins retained responsibility for the investment portfolio. Gifford's new duties included reporting to the board, becoming part of the steering committee, reporting on interest rate risk, and being ultimately responsible for all financial reports.

Republic characterizes Gifford's elevation as a promotion. In a memorandum written at the time by Dennis Ibold, the chairman of the board, however, Ibold suggested that Gifford receive a raise due to his increased responsibilities and workload, and did not use the term promotion. Relying on this, Burns claims that he merely had increased responsibilities. This Court does not believe that the characterization of Gifford's elevation to acting CFO is material. This Court finds as a matter of fact, and it is undisputed, that Gifford became acting CFO and that he acquired a number of additional and new responsibilities.

Gifford did in fact receive a raise as a result, increasing his salary from $51,000 to $55,000. He also received an increase in his bonus from ten percent to fifteen percent. Gifford did not receive a golden parachute, however, nor was he given the title of senior vice president. Likewise, his bonus was not increased to 20 percent, which is what the senior vice presidents received. Burns' sala-

ry was $58,045 at the time, and her bonus was 20 percent.

## M. Burns' Initial Protests

Back in February of 1992, as part of her salary review, Burns asked Fritzsche how KPMG made salary recommendations. Fritzsche explained that KPMG had used the position descriptions Horizon had given it. Burns complained that her job description did not include her lending and branch responsibilities. Burns received the same percentage increase as the other senior vice presidents did, which was pegged to inflation. This increase was provided for in the contracts of the other senior vice presidents. Burns received this increase even though she lacked such a contract.

On the day before Fritzsche was terminated, Burns made a written request to him for a golden parachute for her and Karen Rhodes. The letter did not mention discrimination. Rather, the letter focused on the fact that many of Horizon's employees believed that the bank's future was precarious. She stated that if, hypothetically, her position and Rhodes' position were to become vacant, it would send a message to the employees that the ship was sinking. She also stated that it would be difficult to replace her, and that Horizon would be dealing with the effects of this hypothetical for a long time.

Because Fritzsche was terminated, Burns provided a copy of this memo to Ibold and, at Ibold's request, to Hawkins. This request was provided to the compensation committee. The board rejected this request, citing its 1991 decision not to enter into any more golden parachutes.

During this time, Burns signed a middle management contract extension to which she added a written disclaimer regarding her rights to pursue the differential contract benefits. Hawkins twice asked Burns to sign an extension without the disclaimer, but she refused.

6. The termination was "without cause" under Fritzsche's employment agreement and resulted

in him receiving a generous severance package.

### N. Merger With Republic

In October of 1992, Horizon agreed to merge with Republic. Under the terms of the merger agreement, Republic would be the surviving entity and Horizon would cease to exist. The merger was approved by the shareholders of both corporations in 1993 and became effective on June 30, 1993. As part of the merger agreement, Republic agreed to pay the golden parachutes of Hawkins, Larkins, and Moyers.

### O. Scheshunoff Study

In determining the salaries of its senior managers at the end of 1992, Horizon relied on, *inter alia,* a study by Scheshunoff Information Services ("Scheshunoff"). The Scheshunoff study is a survey of banking institutions to determine what people in various positions in the banking industry earn. It is not a study which is particular to Horizon.

According to the Scheshunoff study, the median salary for persons in Burns' position of senior marketing officer was $48,882. In reviewing the Scheshunoff study, however, Hawkins noted that while many of Burns' responsibilities were similar to those in the description of the position of senior marketing officer described in the Scheshunoff study, many of her responsibilities were also similar to those in the study's description of the position of senior operations officer. The median salary for persons in the position of senior operations officer was $70,503.

Hawkins concluded that neither position was an accurate description of Burns' position, and that Burns' position was somewhere between the two. He concluded that Burns' position was more comparable to the description of senior operations officer in the Scheshunoff study. Accordingly, he proposed that she be given a raise to $60,000, which was approved. Burns complained that this did not reflect her lending responsibilities and asked for a further adjustment, which Hawkins rejected. Burns' maximum bonus was 20 percent, which was the same maximum bonus as the other senior vice presidents.

Hawkins conducted a similar analysis of Gifford's position, noting that Gifford's position was not similar to that of the controller because he also had the responsibilities of a CFO. Gifford also received a raise to $60,000, which was between the median for the controller and CFO positions. Gifford's maximum bonus was fifteen percent.

The other senior vice presidents received a smaller percentage raise than Burns. Larkins, the senior vice president of operations, received a raise to $77,978. Moyers, the senior vice president of lending, also received a raise to $77,978. The Scheshunoff study median for senior lending officer was $74,500. Shortly after these raises were given, in February, 1993, Burns discovered that the golden parachutes had been changed so that they were triggered by any merger.

### P. CRA Problems

Horizon's merger with Republic was delayed due to its poor CRA rating. As Horizon's lead person on CRA issues, Burns was required to spend a large amount of time (25% by her own reckoning) on CRA issues in the spring of 1993.

In March, 1993, Horizon hired Al Blank as executive vice president for mortgage lending. As part of his compensation package, Blank was to receive Republic stock options. When Blank was hired, Horizon announced that he would be the new CRA officer. Burns assumed that her CRA duties would be assigned to Blank. Accordingly, in April of 1993, Burns sent a memo requesting assistance in transferring her CRA duties to Blank.

At a board meeting in April of 1993, the issue of CRA came up. One of the board members, Lyman Treadway, asked Burns if she would be giving some of her salary to Blank in exchange for the CRA duties. Treadway also stated that he did not want Blank's time taken up with CRA matters. Burns testified that Treadway was serious when he made these statements, which she perceived as a threat. Treadway testified that he was half-facetious when he made the statement. In any case, the duties were not transferred, Burns' salary was not reduced, and the merger was ultimately approved.

## Q. Burns' Meeting With Ibold

On June 23, 1993, Burns met with Ibold. Burns claims that she told Ibold that "her statute of limitations began to run in February," when she discovered that the golden parachutes had been revised. She also said that she wanted the same opportunity the other senior vice presidents had, which was the opportunity to leave with a lump sum settlement. It is also undisputed that she told Ibold that she was going to see a lawyer. She did not specifically mention discrimination, however. The next day, Burns sent a follow-up letter to Ibold, asking for a settlement. This letter again references February, 1993, but does not mention discrimination, statute of limitations, lawyers, or a lawsuit.

During that conversation, Ibold told her that at least one of these courses of action would be detrimental to her career. Ibold claims that he made this statement in response to Burns' suggestion that she was going to ask the board for a golden parachute or a lump sum settlement. He believed that the board would not give her such a contract, and that asking for such a contract or settlement would only hurt Burns. Ibold also said he made a similar statement in response to Burns' threat to see a lawyer. Ibold claims he understood this to mean that she would have an attorney write a letter to the board asking for a golden parachute or a lump sum settlement. He denies that she ever mentioned a statute of limitations. Ibold, an attorney, further testified that it did not occur to him that when Burns told him that she was going to see an attorney, she was threatening to file a lawsuit, let alone a discrimination action. Ibold also told Burns that she was going to be the most senior officer remaining from Horizon and that it would be a great opportunity for her to show what she could do. Burns testified that Ibold made his statement that it would be detrimental to her career in response to her statement that her statute of limitations began to run in February.

This Court finds both Burns and Ibold credible on this issue. This Court finds that Burns believed that she was threatening a lawsuit. It also finds that Ibold did not understand her to be threatening a lawsuit. However, this Court also finds that a reasonable person, especially an attorney, in Ibold's position, would have understood Burns to have been threatening a lawsuit. This is especially so in light of the effort the board went through to determine that denying Burns a golden parachute was not discriminatory.

## R. Implementation Of Merger and Initial Transition Action Plan

The merger became effective on June 30, 1993. Hawkins, Larkins, and Moyers exercised their golden parachutes and left Republic. Blank was made interim president of Horizon. David Stickel, the president of Republic Bank in Flint, served as liaison between Republic and the former Horizon.

Stickel began implementing transition action plans, which were essentially lists of projects which needed to be accomplished during the transition. Stickel developed the transition action plans by talking with the departing senior officers and the steering committee, which included Burns. Duties were generally assigned to individuals because the duties were within their normal areas of responsibility or because they volunteered for them. Stickel testified that if any members of the steering committee felt that a duty was improperly assigned to them, they could raise the issue at a meeting. Other employees agreed, stating that objectives and deadlines were discussed at weekly meetings during which employees were free to express their opinions on whether the deadlines were reasonable.

The first transition action plan was implemented on June 30, 1993, although Burns apparently did not see it until the second week in July. Burns testified that she did not have any input into the plan. Under this plan, Burns' duties included:

(1) reviewing Asset Liability Committee (ALCO) position and liquidity position;

(2) reviewing and rewriting the branch incentive plan;

(3) reviewing and rewriting the branch marketing plan;

(4) conducting the branch managers' meeting;

(5) introducing the signature account;

(6) reviewing and identifying product lines to offer;

(7) helping (with four others) to analyze the Wickliffe office relocation; and

(8) helping (with four others) to review and audit the CRA action plan.

This constituted a large amount of work for Burns. However, all the employees on the steering committee had a large amount of work to do during the transition.

Burns does not dispute that all of the duties assigned to her other than the ALCO assignment were within her area of responsibility. ALCO is concerned with the allocation of assets and the flow of funds into and out of the bank. As a result, it was involved in the setting of savings rates, which was something with which Burns, as the senior marketing manager, would normally be involved. Hawkins testified that Burns was on ALCO.

In contrast, Burns claimed to know nothing about ALCO, and in fact claimed that she did not even know what it was until she heard Hawkins testify about it. She further claimed that it was not within her normal areas of responsibility. This Court simply does not find Burns credible on this issue. Even if Burns had never heard of ALCO prior to July of 1993, it is simply not believable that Burns would not have at least asked what ALCO was when it was assigned to her. Moreover, the testimony of every other witness was that ALCO fit within Burns' area of responsibility. These witnesses included Hawkins and Gifford, neither of whom are currently employed by Republic. In fact, Gifford was terminated by Republic and would have no incentive to testify in its favor.

### S. Burns' Meetings With Stickel And Blank

On July 1, 1993, Stickel held an employee orientation meeting at Horizon. Before the meeting started, Burns had a conversation with Stickel in which Burns testified that Stickel told her in a sarcastic tone that he had a matter to discuss with her, "if she was going to stay." Later that day, Burns had a conversation with Blank in which she broke down and cried, and told him that she could not function or be productive. Blank reported this conversation to Stickel and Ibold, at which time Ibold reported his earlier conversation with Burns.

### T. Burns' Meeting With Mayne

Later in July of 1993, Burns met with Mayne, who had resigned from Horizon's board in 1992. Burns testified that Mayne told her that Mayne had nothing but contempt for men after her experience on Horizon's board and also told Burns that she was never going to get a contract because she was a woman. Mayne did not recall making any such statements. In addition, Mayne testified unequivocally that Burns' gender had nothing to do with Burns not getting a golden parachute.

 As an initial matter, this Court notes (as a matter of law) that Burns' testimony as to Mayne's alleged statements is inadmissible hearsay. It is an out-of-court statement offered for its truth. Fed.R.Evid. 801(c). Nor is it admissible as the admission of a party-opponent under Fed.R.Evid. 801(d)(2). At the time Mayne allegedly made these statements, she was not a member of the board. In addition, these alleged statements do not relate to events that occurred during Mayne's tenure on the board; they relate to her own feelings and her estimate as to what the board would do in the future. Thus, they do not fit within the scope of Mayne's role as a board member, and do not constitute an admission by Republic. Accordingly, this Court will not consider this evidence.

Even if Burns' testimony were admissible, this Court finds Mayne's testimony more credible on this issue. Mayne left Horizon as a result of disagreements she had with the rest of the board. She would have no reason to testify favorably to Republic. She testified that gender had nothing to do with Burns' not getting the golden parachute. In contrast, Burns' testimony is not as believable; she never mentioned Mayne's alleged statements in her deposition or in her summary judgment brief. Accordingly, this

Court finds that Mayne did not make these statements.

## U. The First EEOC Charge And Second Transition Action Plan

On July 30, Burns filed her first EEOC charge, claiming that Horizon had discriminated against her in the terms and conditions of her employment. She did not make a retaliation claim at this time. The charge was served on Republic on August 9.

On August 1, Stickel implemented the second transition action plan. Burns retained the responsibilities she had under the original transition action plan, except for the branch managers meeting, which had already occurred. She also acquired the responsibilities of (1) reviewing the North Olmsted lease and reducing its costs; (2) instituting the weekly branch managers' schedule; and (3) helping (with one other person) to analyze the top ten markets in Cleveland for branch expansion. Burns had more tasks under this plan than any other individual. In addition, all her tasks had target completion dates of August 31 or earlier. All these tasks were within her area of responsibility, however.

On August 2, a steering committee meeting was held at which Burns was required to give updates on four items, more than anyone else. Other people were also required to give updates, however. Burns testified that she did not ask Stickel to put things on the agenda because he tended to cut her off. The steering committee met again on August 9, and again Burns had to give more updates than anyone else, although others also gave updates. In fact, Burns conceded that it made sense for her to give at least some of these updates. At this meeting, Burns was also assigned responsibility for renegotiating the Green Machine contract. This is an item which would have formerly been the responsibility of Larkins, but it fell to Burns with Larkins gone.

On August 10, 11, and 13, Stickel asked Burns for written updates on various items, which Burns provided. On August 15, Burns also provided a written update to Stickel. Stickel made comments on the update, asking Burns when certain tasks would be completed, who would answer questions posed in the update, or asking her to define certain terms, such as "aggressive." Responding to a question from the Court, Burns conceded that Stickel's request to define aggressive might have been reasonable. In fact, after a review of the comments, this Court finds that they were reasonable.

## X. Burns' Depression

During this time, Burns' emotional state was in decline and she was referred by her attorney to Dr. Lynne Bravo Rosewater, a clinical psychologist. She first saw Dr. Rosewater on August 26. Dr. Rosewater testified that Burns was not functioning well, her thought pattern was very confused, and she had trouble thinking clearly. She diagnosed Burns as suffering from post-traumatic stress disorder (PTSD) with endogenous depression. In other words, she concluded that Burns was depressed and that the depression was due, at least in part, to PTSD. PTSD is typically caused by a very stressful event (the "stressor"), which is often life-threatening, e.g, war or a natural disaster. Dr. Rosewater testified that the stressor in this case was Burns' treatment at the Bank. Dr. Rosewater based her diagnosis at least in part on a Minnesota Multiphasic Personality Inventory (MMPI) which she gave to Burns on August 29.

Later, at Republic's request, Burns was examined by Dr. Robert Kaplan. Dr. Kaplan also administered an MMPI test to Burns, as well as a Millon Clinical Multiaxial Inventory. Dr. Kaplan agreed with Dr. Rosewater that Burns was depressed. He did not agree that she suffered from PTSD, however. Instead, he concluded that she had a narcissistic personality disorder, which predisposed her to depression when things did not go her way.

There are flaws in both psychologists' analyses. Dr. Rosewater apparently made errors in scoring the MMPI. According to Dr. Kaplan, these errors were significant in that they may have changed the diagnosis. Likewise, Dr. Kaplan relied too heavily on a computer analysis of the test results.

That said, this Court finds that Burns was depressed, a fact on which both psychologists agree. This Court does not find that she

suffered from PTSD. The evidence demonstrates that post-traumatic stress disorder is not an appropriate diagnosis absent a life-threatening stress. However, this Court does find that the depressive episode was caused, at least in part, by Burns' perception that she had been treated unfairly and discriminated against.[7] Finally, this Court finds that Burns did not have a narcissistic personality disorder.

### Y. August 30 Meeting And Burns'. Disability Leave

On August 30, a steering committee meeting was held at which Burns again was required to give more updates than anyone else. Other employees were also required to give updates. Stickel was present at the meeting by telephone. At the meeting, Stickel spent more time on Burns' responsibilities than on those of any other member of the committee. He also questioned Burns in a manner that she perceived to be hostile and told Burns that they would have to meet when he got back into town. Burns was distraught as a result of the meeting.

After the meeting, Burns had a conversation with Gifford in which she claims that she told Gifford that she had filed an EEOC charge. According to Burns, Gifford responded that "that [the EEOC charge] explains it [the conduct towards Burns]." Gifford denied making any such statement. This Court finds Gifford more credible on this issue. Gifford was subsequently asked to resign by Republic and would have no reason to provide favorable testimony. Moreover, Burns did not mention this alleged statement in her deposition or in response to the motion for summary judgment. It came out for the first time at trial.

After the meeting, Burns called Dr. Rosewater. Dr. Rosewater recommended that she leave work and go on disability leave. Burns did leave work that day, and never returned.

Dr. Rosewater informed Republic that Burns was suffering from depression and PTSD, and Republic placed her on short-term disability. Burns remained on short-term disability until January, 1994.[8] It was as a result of Burns' request for short-term disability that Republic sent her to Dr. Kaplan. Dr. Kaplan suggested that she return to work with a reduced work load and that Republic make a special effort to praise Burns for her accomplishments during this period of time. Dr. Kaplan sent his report to Republic.

### Z.1993 Bonuses

While Burns was on disability leave, Republic determined its employees' bonuses for 1993. In September, Keeney sent a memo to the board listing proposed bonuses. Burns was included on this list. She was later dropped from this list and received no bonus. In contrast, Blank and David Williams, who was hired on September 1, 1993, both received bonuses.

### AA. Burns' Termination And Replacement

Also in September, Blank proposed to the board that Burns' position be restructured so that she would have only marketing duties and that her other duties be placed in a new position. In November, a listing of Republic's executive officers no longer included Burns. In January, 1994, Dr. Rosewater informed Republic that Burns was not able to return to work because she was still recovering. On January 24, Burns filed a second charge with the EEOC, alleging retaliation. On February 2, Keeney sent a letter to Burns informing her that her position had been eliminated.

In late January, Michael Perry interviewed at Republic for Burns' restructured position. Perry was employed at Society Bank, where he made approximately $60,000 per year,

---

7. It is important to note the limited scope of this finding. This Court does not find that Burns' depressive episode was caused by any discrimination by Republic, but, rather, by Burn' perception that she had been discriminated against.

8. Burns' short-term disability expired in January, and Burns did not receive long-term disability. The circumstances surrounding Burns' failure to receive long-term benefits are discussed in this Court's memorandum and order deciding Republic's motion for summary judgment, and will not be discussed again here.

plus incentives. Republic offered Perry the position at salary of $55,000, with incentive bonuses which could earn him up to $99,000. Perry turned down the position because it would have been a reduction in pay and because the incentive compensation was too risky.

In March of 1994, Republic offered the position to Denise Long. It offered Long a salary of approximately $50,000, plus incentives. Long was unemployed at the time and had been unemployed for six months. She had previously been employed by Charter One Bank at a salary of $45,000. Long accepted the position. Republic hired Long as a vice president. Long took over many, but not all, of Burns' responsibilities.

Burns filed a third EEOC charge in September of 1994, again alleging retaliation.

### BB. Hiring of New CEO

Republic also hired a new President and Chief Executive Officer. It first offered the position to Joan LaMarca at a salary of $80,000 plus incentives. She was also offered 10,000 stock options. Prior to this, LaMarca was making approximately $70,000 per year. LaMarca turned the position down. Next, Republic offered the position to Jane Grebenc, again at $80,000 per year plus incentives, and again with 10,000 stock options. Grebenc had previously been making $75,000 per year. Grebenc also turned the position down. Finally, Republic offered the position to Joseph Rusnak. Republic offered Rusnak $100,000 per year plus incentives and 10,000 stock options. Rusnak had previously been making $111,000 per year. Rusnak accepted the position.

### CC. Severance

Burns did not receive any severance pay. In August, 1993, Burns' counsel requested $210,000 in severance pay, plus the acceleration of unfunded benefits and vesting of retirement benefits, to resolve all claims. In December, 1993, Burns' counsel increased the amount to $350,000. Republic decided to turn down these requests.

Republic subsequently let Gifford, Keeney, and Long go. It gave them $30,000, $19,640, and $20,000 in severance, respectively. In exchange for these severance payments, the former employees released any rights or claims they may have had against Republic. None of them demanded payments of the magnitude sought by Burns.

## II. CONCLUSIONS OF LAW

### A. Count I (Gender Discrimination)

█ In Count I, Burns claims that Republic discriminated against her because of her gender in violation of Title VII of the Civil Rights Act of 1964.[9] Title VII makes it unlawful, *inter alia*, to "discriminate against any individual with respect to his compensation . . . because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). In Count I, Burns claims that defendants discriminated against her in terms of her compensation because she was a woman. A claim for unequal pay under Title VII is judged by essentially the same standards as a claim under the Equal Pay Act. *Henry v. Lennox Indus., Inc.*, 768 F.2d 746, 752 (6th Cir.1985) (citation omitted). Therefore, to establish a prima facie case under Title VII, Burns must demonstrate that she was paid less than men for substantially equal work. *Id.* As this Court stated in its ruling on defendants' motion for summary judgment, however, this Court has already found as a matter of law that Burns' responsibilities were not substantially equal to those of her colleagues, and Burns cannot make out a prima facie case.

█ The absence of a member of the opposite sex in an equal but higher-paying job does not preclude a Title VII action for wage-based discrimination, however. *County of Washington v. Gunther*, 452 U.S. 161, 168, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); *Henry*, 768 F.2d at 752. In such a case, a plaintiff who is not similarly-situated can prevail by demonstrating that the wage inequality resulted from intentional discrimination, i.e., that the defendant was motivated by

---

9. As filed, Count I also stated a claim for discrimination in violation of the Equal Pay Act, 29 U.S.C. § 206. This Court granted Republic's motion for summary judgment on the Equal Pay claim, however.

impermissible gender-based considerations in setting wages. *International Union, U.A.W. v. State of Michigan,* 886 F.2d 766, 769 (6th Cir.1989). The plaintiff may use statistical or circumstantial evidence to prove that such intentional discrimination occurred. *Id.* However, discriminatory intent may not be inferred from the employer's failure to depart from free-market parameters or failure to rectify traditional wage disparities. *Id.*

■ It is not sufficient for Burns to demonstrate that she was treated differently from her colleagues; her colleagues were not similarly-situated. Nor is it sufficient for her to demonstrate that she was not paid her true, or comparable, worth, or even that she was treated unfairly. Rather, she must demonstrate that her gender was a motivating factor in determining her salary and benefit package. 42 U.S.C. § 2000e–2(m).

■ In light of this standard and the findings of fact made above, this Court finds that Burns' gender was not a motivating factor in determining the terms and conditions of her employment.[10] Burns claims that she was discriminated against in several different terms and conditions of her employment. Each is dealt with in turn.

### 1. Salary

Burns claims that gender was a motivating factor in determining her salary. Burns' salary discrimination claim is largely premised on comparisons to the other senior vice presidents who were paid more than she. As this Court has already found, however, the other senior vice presidents were not her comparators; they had different responsibilities and more experience, both in banking and with Horizon. Significantly, even the KPMG study found that Burns' position was not comparable to those of the other senior vice presidents. Moreover, Burns received higher annual percentage increases then the other senior vice presidents on average. This Court does not find that gender motivated the difference between Burns' salary and that of the other senior vice presidents.

Burns makes much of the fact that Fritzsche said in a salary review that he considered the three other senior vice presidents to be equally valuable. As noted, however, Fritzsche's comment concerned the *other* senior vice presidents. It does not prove that he, or anyone else, considered Burns the equal of the other senior vice presidents; in fact, it is irrelevant to that question.

In many respects, Burns' closest comparator was Gifford, and not the other senior vice presidents. When Hawkins was promoted to president, Gifford took over almost all Hawkins' responsibilities, although Gifford was not given the title of senior vice president. Thus, Gifford was doing the work that Hawkins, a senior vice president, had previously been doing. In addition, he sat on the steering committee with Burns. Yet Gifford never earned more than Burns; at times, he earned less than Burns. This is strong evidence that Burns' gender was not a motivating factor in determining her salary.

Burns relies heavily on the KPMG and Scheshunoff studies. However, these studies actually indicate that her gender was not a motivating factor in determining her salary. The KPMG study recommended a large increase for Burns and smaller increases for the other senior vice presidents. Horizon implemented the recommended increases. Burns argues that she was discriminated against in the KPMG study because Mayne told Hauschulz that Burns did not have much banking experience. Experience was not something that KPMG considered in making its recommendations, however, because the purpose of the study was to survey the compensation paid to senior management in other institutions, based on their respective duties and responsibilities, not on their individual qualifications. In addition, Burns claims that she was discriminated against in the KPMG study because Horizon withheld vital information from KPMG regarding her job duties. As this Court has found, however, Horizon did not withhold that information. KPMG's notes indicate that it had this information, whether or not it used it. Even

10. Although this finding is included within the conclusions of law, it is more appropriately considered a finding of fact. *See Pullman–Standard*

*v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

assuming that KPMG erred in recommending a salary for Burns, that would not demonstrate that Horizon was motivated by gender in setting that salary; it would merely establish that KPMG made a mistake.

Likewise, Horizon's use of the Scheshunoff study does not support Burns' claim. In using that study, Hawkins credited Burns for her branch management responsibilities by recommending that her salary be set approximately halfway between the median salary for senior operations officer and median salary for senior marketing officer. Significantly, he used the same general principle for Gifford, recommending a salary between the median salary for CFO and the median salary for controller. Again, this undermines, and does not support, Burns' claim that her gender was a motivating factor.

Burns also claims that she was discriminated against because she did not receive salary increases at the time she received responsibilities for the branches or CRA. Whether this is fair is not for this Court to say. However, it does not support Burns' claim for gender discrimination. The unrefuted evidence shows that senior employees often received new duties without receiving additional compensation. Burns observes that Gifford received a salary increase when he took over Hawkins' duties. Gifford's circumstances were far different, however; he took over almost all of Hawkins' duties, not just one or two new duties, and he also became acting CFO. This difference does not demonstrate gender discrimination. Moreover, this Court finds this argument somewhat disingenuous. Although Burns did not receive a salary increase at the precise moment that she acquired the CRA or branch responsibilities, her salary was in the process of increasing from $34,000 to $60,000 in five years. Obviously, those increases reflected, at least in part, her increased responsibilities.

Burns attempts to rely on the experience of the branch managers to show that Horizon had a practice of discriminating against women. Again, this evidence does not support a

finding of discrimination. The evidence demonstrates that Burns hired Mohorcic while she was in the process of reducing the salaries of the other branch managers. Keeney noticed that the salary reductions would equalize the women's salaries with Mohorcic's, and the salary reductions were stopped or slowed as a result, so that Mohorcic earned less than the female managers. This does not help Burns' claim.

■ Similarly, the experience of other women after Burns left does not support a finding of gender discrimination. Burns notes that Long was offered less money than Perry. Perry had been earning more at his previous position than Long had. In addition, Long had been out of work. Under such circumstances, it was entirely reasonable, and not evidence of discrimination, for Republic to offer Perry more money than Long. Likewise, Republic offered LaMarca and Grebenc less than Rusnak. LaMarca and Grebenc had been making less money in their previous positions, however. In fact, LaMarca and Grebenc would have increased their salaries if they had taken the position, while Rusnak actually suffered a pay cut in taking the job. There is a reasonable, non-discriminatory reason for these discrepancies; they do not support a finding of discrimination. For all these reasons, this Court finds that Burns' gender was not a motivating factor in determining her salary.

## 2. Stock Options

Next, Burns claims that she was discriminated against because she did not receive as many stock options as the other senior vice presidents. While Burns did not receive as many options as the other senior vice presidents, this Court concludes that gender was not a motivating factor behind that result for the reasons discussed below.

Again Burns relies heavily on the KPMG study, which suggested that Burns was under compensated in stock options.[11] The same KPMG study also found that Fritzsche was under compensated in stock options.

---

11. The reason Burns originally had fewer options than the other senior vice presidents was because many of the options issued were issued before she was hired; all were issued before she was promoted to senior vice president.

Horizon did not give either Fritzsche or Burns any additional stock options, however. This was because Horizon did not issue any additional options after this point. Whatever the reason for this decision, the fact that neither Fritzsche nor Burns received additional options convinces this Court that gender was not a motivating factor in not giving Burns more options.[12]

Burns argues that although Horizon never issued any additional options, Republic did. Republic issued options to, *inter alia*, Blank, Williams, and Rusnak. Republic also offered options to women such as LaMarca and Grebenc, however. In fact, Republic offered LaMarca and Grebenc the same number of options it offered Rusnak. This demonstrates that, whatever Republic's reasons for offering the options it did, gender was not a motivating factor in that decision.

### 3. Vacation

The KPMG study noted that typical vacation for all senior officers was four weeks. Horizon instead based vacation on years of experience. This is a perfectly reasonable, typical, and non-discriminatory basis for awarding vacation. Accordingly, this Court finds that Burns' gender was not a motivating factor in determining her vacation.

### 4. Golden Parachute

 This is the issue which has given this Court the most difficulty. It is undisputed that Burns was the only senior vice president not to receive a golden parachute. It is also undisputed that she was the only senior vice president who was a woman. From this disparity, one could infer that Burns' gender was a motivating factor in the decision not to give her a golden parachute.

After a careful review of the full record, however, this Court finds that gender was not a motivating factor in that decision. As an initial matter, all the board members or former board members who testified stated that Burns' gender played no part in the decision. Although these witnesses testified with varying degrees of credibility, this Court particularly credits the testimony of Dr. Mayne. Dr. Mayne resigned from the board as a result of disagreements she had with a number of the bank's actions. She stated that she had a personal animus against the board. Yet she testified unequivocally that Burns' gender played no part in the decision not to award her a golden parachute. In response, Burns attempts to rely on a conversation in which Mayne allegedly told Burns that she would never get a contract because she was a woman. As discussed above, however, this Court finds this evidence inadmissible. Moreover, even if it were admissible, this Court finds Mayne more credible than Burns on this issue.

In addition, this Court finds Horizon's explanation for the failure to offer Burns a golden parachute entirely plausible. It is not disputed that at the time Horizon failed to offer Burns a golden parachute, the board was under pressure from dissident shareholders who had singled out the golden parachutes for criticism. Under such circumstances, it would be entirely reasonable not to award Burns a golden parachute. In fact, the undisputed testimony was that if the board had to give Burns, or anyone else, a golden parachute if it promoted them to senior vice president, it would not have approved the promotion.

Burns rightfully points out that the board continued to renew the other senior vice presidents' golden parachutes, a course of conduct contrary to the will of the shareholders. Again, this Court finds that Horizon has come up with a plausible explanation for the discrepancy. The golden parachutes for the other senior vice presidents had been disclosed when Horizon went public, so anyone who bought stock was on notice of these agreements. A golden parachute for Burns

---

12. In response, Burns makes much of the fact that Fritzsche's contract was modified to pay him for options he elected not to exercise. This is not the same as granting of new options, however. Moreover, this was done in the context of a modification to his contract which reduced his severance pay. It does not show that he was treated better than Burns because he was a male. Even if it did, this Court would find that Republic's offering of options to LaMarca and Grebenc, both female, demonstrates that gender was not a motivating factor in the stock option decision.

would have been a new, undisclosed agreement. This is a sufficient and reasonable explanation for the apparently disparate treatment.

More problematic is Horizon's subsequent decision to modify the golden parachutes to make them effective upon any takeover and not merely a hostile one. This is quite difficult to reconcile with its stated reason for not giving Burns a golden parachute; if the shareholders were against golden parachutes, then they would presumably be more against parachutes which would be effective upon any takeover. The Court finds that the bank has adequately explained this apparent contradiction, however. The board had been considering modifying the parachutes since before Burns was made a senior vice president, although it did not do so until after Burns had been promoted. More important, the board had received advice that altering the parachutes would make them a more attractive, rather than a less attractive, merger candidate. From this perspective, modifying the parachutes was not contrary to the wishes of the shareholders; rather, it was in accord with those wishes.[13]

Two additional factors help convince this Court that Burns' gender was not a motivating factor in the decision not to give her a golden parachute. First, the board took the trouble to seek legal advice regarding this issue at the time it promoted Burns. Although the board did not believe it was discriminating, it wanted to make sure that it would not be perceived as discriminating. The board was told that it would not be discriminatory to deny Burns a golden parachute if it did not give parachutes to anyone else. The board followed this advice. This conduct is not consistent with a discriminatory motive.

Second, a comparison with Gifford is again instructive. Gifford sat on the steering committee with Burns. Gifford took over almost all the duties of Hawkins, who had been a senior vice president. Like Burns, Gifford did not receive a golden parachute. This strongly suggests that gender was not a mo-

tivating factor in the decision to award a golden parachute. Burns correctly observes that Gifford was never promoted to senior vice president. Burns makes too much of her title, however. It is undisputed that Burns only received the title of senior vice president in order to give her the clout to implement the new incentive compensation system. If the bank was required to give Burns a golden parachute, it would not have promoted her. Thus, the Court does not consider the difference in title between Burns and Gifford significant, and Gifford's failure to receive a parachute is strong evidence weighing against Burns' claim.

In summary, although this is a close and difficult question, this Court finds that Burns' gender was not a motivating factor in the decision not to give her a golden parachute.

### 5. Bonus

Burns does not appear to contend that her bonus prior to 1993 was motivated by her gender. Nor could she, since she received the same bonus as the other senior vice presidents. Instead, she claims that the decision not to give her a bonus in 1993 was motivated by gender. This Court finds that it was not so motivated. The evidence shows that only those employees who were working at the bank when bonuses were awarded got bonuses. Burns was out on disability leave from August 30 on. Other employees, including male employees, who left the bank during the year did not receive bonuses. Burns has not identified a single employee who received a bonus who was not working when bonuses were awarded. Thus, this Court concludes that gender did not motivate this decision.

### 6. Severance

Finally, Burns claims that she was discriminated against due to her gender because she did not receive severance pay. The evidence reveals that other employees who were terminated or asked to resign did receive sever-

---

**13.** Although this Court is not convinced that the shareholders appreciated this decision, it is convinced that the board had reason to believe that modifying the golden parachutes was not contrary to the shareholders' wishes.

ance pay. These employees included Long, a woman, which convinces this Court that gender was not a motivating factor in the decision. Moreover, this Court finds Republic's explanation for the discrepancy perfectly reasonable. The other employees had released any rights or claims in exchange for their severance pay. Burns, through her attorney, had been making demands far in excess of the amount of severance paid to the other employees. In such circumstances, it is legitimate for Republic to decline to pay a severance comparable to what it paid the other employees, especially when it would receive nothing in return.

### 7. Conclusion

None of this is to say that Burns was treated fairly, that Horizon paid her what she might have been worth, or that she has no basis to complain. Rather, it is to say that her gender was not a motivating factor in setting the terms and conditions of her employment. Accordingly, this Court finds for Defendants on Count I.

### B. Count VII (Retaliation)

■■■ In Count VII, Burns claims that Republic retaliated against her for the exercise of her rights under Title VII. Title VII prohibits retaliation in two instances: (1) where the employee has opposed any unlawful employment practice ("opposition clause"); or (2) where the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing ("participation clause"). 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, the plaintiff must show: (1) she was engaged in a protected activity; (2) she was the subject of an adverse employment action; and (3) that there is a causal link between the activity and the adverse employment action. *Johnson v. United States Dep't of Health and Human Serv.*, 30 F.3d 45, 47 (6th Cir.1994). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate reason for the challenged action. *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir.1997). If the defendant does so, the plaintiff must

present evidence that the proffered reason is a pretext. *Id.* Burns has two remaining bases for claiming retaliation in this action: (1) her assignments under the transition action plans; and (2) Republic's failure to give her severance pay. Each will be dealt with in turn.

### 1. Transition Action Plans

■■■ First, Burns claims that she was retaliated against through her assignments under the transition action plans and in her treatment by Stickel. As an initial matter, her assignments under the transition action plans were made on June 30 and August 1, 1993. Burns' first EEOC charge was not served on Republic until August 9, 1993. Thus, her assignments under the transition action plans cannot result from any retaliation for her filing the charge.

■■■ Burns attempts to avoid this problem by relying on her conversation with Ibold on June 22 or 23. This conversation does not amount to participation under Title VII. Participation requires the actual filing of a charge; a threat to file a charge is not sufficient. *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 & n. 3 (6th Cir.1989). Whether the conversation amounts to opposition under Title VII presents a closer question. A vague charge of discrimination in an internal letter or conversation is not sufficient to constitute opposition. *Id.* at 1313–14. As discussed above, this Court concludes that a reasonable person in Ibold's position would have understood that Burns was threatening a discrimination lawsuit. Accordingly, this Court finds that Burns was engaged in opposition when she had the conversation with Ibold.

In contrast, this Court does not find that Burns was engaged in opposition before that conversation. Burns relies on her earlier requests to Fritzsche and Ibold, and her inclusion of disclaimers on her employment contract. Her requests to Fritzsche and Ibold do not mention discrimination, nor do they even mention a lawsuit. In fact, the letter she wrote couched her argument entirely in terms that it would be best for the bank if she received a golden parachute and threatened to leave. Similarly, her "reserva-

tion of rights" did not mention discrimination. At best, these communications do not even rise to the "vague charge of discrimination" which was found insufficient in *Booker.* Even if this were opposition, no retaliation sprang from it. These actions occurred a year before the alleged retaliation, with no alleged retaliation prior to this point. This Court cannot find that the retaliation began a year later in some kind of delayed reaction.

Burns claims that her assignments under the transition action plans were an adverse employment action that resulted from her opposition. Even assuming that her assignments were an adverse employment action, this Court finds that Burns has not established a causal relationship between her opposition and the plans. The first plan was implemented by Stickel on June 30. Ibold told Stickel and Blank about his conversation with Burns on July 1. Thus, this conversation cannot have been the basis for the assignments in the original transition action plan. Moreover, Ibold testified that the assignments in the plans had nothing to do with his conversations with Burns. This Court finds Ibold credible on this issue.

Although the second transition action plan was implemented after Stickel was aware of Ibold's conversation with Burns, this Court does not conclude that the two events are causally related. The duties in the second transition action plan are similar to those in the first transition action plan, although they are slightly more extensive. This Court does not infer a causal connection between the additional duties and Burns' opposition. The duties are similar enough to her duties under the first plan that the difference does not give rise to an inference of retaliation. Thus, Burns has not established a prima facie case of retaliation.

Even if Burns had established a prima facie case of retaliation with regard to the transition action plans, Republic has proffered a legitimate reason for the assignments, i.e., they were given to employees based on their normal areas of responsibility. Burns claims that this is a pretext because the ALCO and liquidity assignments did not fall within her normal areas of responsibility. For the reasons discussed above, however,

the Court finds that they did fit within her normal areas of responsibility. Several other witnesses testified that these duties fell within her area of responsibility. Moreover, Burns' testimony on this issue was simply not credible; the Court finds it difficult, if not impossible, to believe that Burns never knew what ALCO was until trial. Accordingly, this Court finds that Republic's proffered reason for the assignments in the transition action plans are not pretextual, and that the assignments in those plans were not motivated by a desire to retaliate against Burns.

■ Alternatively, Burns claims that Stickel's harsh treatment of her was a result of a retaliatory animus. Burns points to Stickel's comments at the July 1 meeting, the fact that she was often required to give more updates at steering committee meetings than anyone else, Stickel's comments on her written update of August 15, and Stickel's treatment of her at the August 30 meeting. As noted above, however, Stickel's comment to her at the July 1 meeting occurred prior to Stickel learning about her conversation with Ibold. Thus, it could not have been motivated by a desire to retaliate.

The other conduct about which Burns complains occurred after her opposition or her participation. Much of that conduct does not even amount to an adverse employment action, however. Even if it did, this Court finds that such conduct was not motivated by any retaliatory animus. First, this Court does not find the fact that Burns had to give more updates than other members of the steering committee amounts to an adverse employment action. The updates regarded matters within her areas of responsibility, and Burns admitted that it was reasonable for her to give at least some of the updates. Similarly, the updates Stickel requested in August also related to her areas of responsibility. As for Stickel's comments on her August 15 written update, this Court concludes that the comments were reasonable, and do not even amount to an adverse employment action.

Burns points to the Green Machine assignment as retaliatory. It was reasonable for Stickel to assign this to Burns due to Lar-

kins' departure, however. In any case, the testimony of every other witness was that they could discuss assignments with Stickel and have them adjusted if necessary. Burns apparently never took advantage of this opportunity.

Burns also relies on Stickel's allegedly poor treatment of her. As testified to by Burns, this Court does not find that this conduct amounts to an adverse employment action. Burns testified that he spent more time on her assignments, asked more questions of her in what she perceived as a harsh tone, and indicated that he needed to speak to her when he got back into town. Even if this were an adverse action, this Court does not find that it was caused by a retaliatory animus. Burns testified that Stickel's poor treatment of her began on July 1 before Ibold told him about the June 23 meeting. Yet Stickel did not know of Burns' protected activity at that time. Thus, Stickel's treatment of her is not attributable to a retaliatory animus.

Finally, Burns relies on her conversation with Gifford in which Gifford allegedly told her that her EEOC charge explained Stickel's treatment of her. As discussed above, however, this Court found Gifford more credible on this issue. Even if Gifford had made this statement, however, it would not show what Burns claims. Gifford was not one of the people allegedly retaliating against her; he could not know the motives of those who did. Moreover, if Burns' version is to be believed, Gifford did not even know of Burns' EEOC charge. This is inconsistent with Burns' theory of a concerted effort to retaliate against her.

In summary, Stickel may not have treated Burns well, or even fairly, but this Court does not find that his treatment of Burns was motivated by a desire to retaliate against her for her protected activity.

### 2. Severance Pay

▉ Burns also claims that she was retaliated against when Republic did not give her severance pay. There is no dispute that this is an adverse employment action which occurred after Burns had filed her first two charges, which constitute protected activity. In addition, Burns' termination without severance occurred shortly after she filed her second EEOC charge, which potentially gives rise to an inference of a causal relationship. In addition, the other employees which Republic let go all received severance pay. Thus, this Court finds that Burns established a prima facie case of retaliation with regard to severance pay.

Republic has produced a legitimate, non-discriminatory reason for this action, however, which is that Burns, through her attorney, was requesting a severance payment far in excess of what the other employees received in order to release her claims.[14] This Court finds this an entirely legitimate reason for treating Burns differently. Moreover, Burns has not convinced this Court that this was not the real reason for Republic's actions. Accordingly, it finds that Republic's decision not to give Burns' severance pay was not motivated by a desire to retaliate against Burns.

### 3. Other Issues And Conclusion

This Court resolved a number of other issues regarding retaliation in ruling on Republic's motion for summary judgment. To the extent Burns raised them again at trial, or claims that other actions, such as Republic's decision not to award her a bonus, were motivated by a retaliatory animus, this Court disagrees. For the reasons discussed above, this Court finds that there was a legitimate, non-discriminatory reason for the decision not to give Burns a bonus, which is that she was out on disability leave. Likewise, for the reasons stated in this Court's ruling on the motion for summary judgment, this Court finds that the other actions complained of were not retaliatory.

Accordingly, this Court concludes that Republic did not retaliate against Burns in violation of Title VII. As a result, it will enter judgment for Republic on Count VII.

---

**14.** Excepting, of course, the other senior vice presidents, who had golden parachutes. This discrepancy is dealt with above.

## III. CONCLUSION

For the foregoing reasons, this Court concludes that Republic and its predecessors in interest did not discriminate against Burns due to her gender in violation of Title VII. Accordingly, it enters judgment for defendants on Count I. Likewise, this Court finds that Republic and its predecessors in interest did not retaliate against Burns due to her protected activities in violation of Title VII. Accordingly, it enters judgment for the defendants on Count VII. The case is dismissed.

This order is final and appealable.

IT IS SO ORDERED.